No. 76,623

DRUCILLA B. ACHEY and JAMES F. ACHEY, *Plaintiffs*, v. LINN COUNTY BANK, DSP INVESTMENTS, LTD., *et al.*, *Defendants*.

931 P.2d 16

Opinion filed January 31, 1997.

*W. Joseph Hatley*, of Lathrop & Gage L.C., of Overland Park, argued the cause, and *Scott M. Herpich* and *Charles F. Zarter*, were with him on the briefs for plaintiffs.

*H. Boone Porter, III*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, argued the cause, and *Louis A. Cohn*, of the same firm, was with him on the briefs for defendant.

*Charles N. Henson*, of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, was on the briefs for *amicus curiae* the Kansas Bankers Association.

The opinion of the court was delivered by

LARSON, J.: The United States District Court for the District of Kansas certified two questions of law for our determination. The United States District Court phrased the certified questions as follows:

"(1) Whether Kansas law, including K.S.A. 17-6602(c)(2), precludes a bank with only one class of stock from reducing the number of authorized shares below the number of outstanding shares?"

"(2) Whether under Kansas law, including K.S.A. 17-6602(c)(2), a minority shareholder has the power to veto a reverse stock split that would eliminate minority shareholders?"

*Answers to certified questions:*

(1) No.

(2) No.

*Factual background furnished by United States District Court.*

"The plaintiffs' complaint alleges that they have been minority shareholders in the Linn County Bank, LaCygne, Kansas (Bank). Under the articles of incorporation, the Bank had authority to issue 2,000 shares of common stock, all of which were outstanding. Each share had a par value of $100. The plaintiffs each owned 80 shares. DSP Investments, Ltd. (DSP), the holding company, owned approximately 85% of the outstanding shares. The individual defendants are members of the Bank's Board of Directors and minority shareholders. Additionally, Donald M. Pease and Susan R. Pease are officers of the Bank as well as officers, members of the Board of Directors, and sole shareholders of DSP.

"In 1993, the Bank's Board of Directors approved a proposed amendment to the articles of incorporation for a reverse stock split of 100 to 1. Pursuant to this proposal, the number of shares would be reduced from 2,000 to 20, with each share having a par value of $10,000. Fractional shares would be canceled with the right to convert into cash.

"The Bank sent each stockholder notice of a special meeting to discuss and vote upon the reverse stock split amendment. The notice stated that DSP had made known its intention to vote all of its shares in favor of the reverse stock split and that no additional affirmative votes were needed because amending the articles of incorporation only required a majority vote. Approximately 85% of the shares were cast in favor of the reverse stock split amendment at the meeting.

"Subsequently, the plaintiffs each acquired an additional 20 shares of common stock to survive the reverse stock split and remain stockholders in the Bank. With the additional shares, each plaintiff would own one share.

"The Bank thereafter notified shareholders of another special meeting to act upon a second proposed amendment, which recommended a reverse stock split of 400 to 1 and which would reduce the number of common shares from 2,000 to 5 with each new share having a par value of $40,000. Again, the proposal prohibited issuing fractional shares of common stock, which would be canceled with the right to convert into cash. Again, the notice stated that DSP had made known its intention to vote all of its shares in favor of the reverse stock split.

"At the second meeting, DSP voted its shares in favor of the second proposed amendment. None of the minority stockholders voted affirmatively.

"The plaintiffs have chosen not to sell their shares, and on April 28, 1995, the plaintiffs filed suit against the defendants, requesting a declaratory judgment that the reverse stock split violated Kansas law."

*Additional facts from the parties' briefs*

Additional facts not appearing in the memorandum and order from the United States District Court, but set forth in the briefs, are as follows:

The Federal Deposit Insurance Corporation approved the second plan for the reverse stock split on December 2, 1993. The Kansas State Bank Commissioner (Commissioner) also approved the plan later that day, and a Certificate of Reduction was filed with the Kansas Secretary of State. The plaintiffs, Drucilla Achey and James Achey, notified the Bank they would not surrender their shares and through their counsel wrote a letter of complaint to the Commissioner, which stated in part: "We don't want to sell and we don't believe the price Mr. Pease offered is fair. . . . We should file a complaint and so we are writing you this letter."

The Commissioner reviewed a response from counsel of the Bank and on December 22, 1993, stated in a letter to the Acheys:

"Although the Office of the State Bank Commissioner is very interested in assuring that Kansas banks are properly regulated and that safe and sound banking practices are occurring, we are of no authority in these types of conflicts.
". . . The question is whether or not the contract has in-fact been breached. Unfortunately, it is not the responsibility of this agency to determine that issue."

No attempt was made by the Acheys to seek administrative review of the Commissioner's statement. The Acheys did not name the Commissioner as a defendant when the case was filed. The Bank, DSP, and the Peases moved to dismiss for failure to name a required party defendant and failure to follow the provisions of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* These issues were not decided by the United States District Court prior to its certification to us of the two questions of law, but the issue of the district court's jurisdiction to hear the matter was argued in the parties' briefs and at oral argument.

*Jurisdiction question*

Before we proceed to consider the certified questions, we must first resolve the jurisdiction question raised by the Bank, DSP, and the Peases.

Our authority for consideration of the questions presented is derived from the Uniform Certification of Questions of Law Act, which states under K.S.A. 60-3201:

"The Kansas supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state."

The issue of jurisdiction had been raised to the United States District Court at the time it certified the questions to us. In so certifying these questions, the court has obviously decided that the questions "may be determinative of the cause then pending in the certifying court." This decision is inconsistent with any belief by the United States District Court that it lacked jurisdiction over the action because administrative remedies had not been exhausted in state court or because a required party had not been named.

Our rule is clear that parties cannot confer subject matter jurisdiction by consent, waiver, or estoppel. *In re Marriage of Harris*, 20 Kan. App. 2d 50, 58, 883 P.2d 785 (1994). Nor can the parties convey jurisdiction on a court by failing to object to its lack of jurisdiction. *Butler v. U.S.D. No. 440*, 244 Kan. 458, 460, 769 P.2d 651 (1989). However, the Bank, DSP, and the Peases cite no persuasive authority that would require us to refuse to answer certified questions which the United States District Court deems determinative of the ultimate issue when a jurisdiction issue of questionable merit has not been expressly resolved.

Further, an examination of the provisions of the Kansas Banking Code, K.S.A. 9-701 *et seq.*, most particularly K.S.A. 9-904, as well as K.S.A. 1995 Supp. 9-1112, clearly shows the interest of the Commissioner in approving proposed changes within a bank's capital stock and structure is to ensure that banks in Kansas maintain adequate capital, not to referee disputes between bank shareholders.

Additionally, an examination of the letter of complaint made by the Acheys' attorney to the Commissioner and his response, stating "we are of no authority in these types of conflicts" and it "is not the responsibility of this agency to determine that issue," appears to settle the question that the issues between the shareholders

raised herein are not a proper subject of action by the Commissioner, nor are they subject to the doctrine of exhaustion of administrative remedies. See *Jenkins v. Newman Memorial County Hospital*, 212 Kan. 92, 95, 510 P.2d 132 (1973).

The stock split required the Commissioner's approval under K.S.A. 1995 Supp. 9-1112(b) to ensure compliance with the Banking Code. It is clear that none of the proceedings before the Commissioner involved an evaluation of the legality of the transaction under the General Corporation Code and, more particularly, under K.S.A. 17-6602(c)(2).

While it may have been more desirable for the United States District Court to have ruled on the jurisdiction issues prior to submitting to us the questions deemed determinative of the matter, we take its certification of the questions as a finding that the jurisdiction issue is without merit. Such is also our conclusion.

We hold the issues raised in this matter are separate from those passed upon by the Commissioner. The questions of law now raised before us could not have been considered or ruled on by the Commissioner in any administrative procedure. We have jurisdiction to answer the questions presented.

*Questions submitted*

The Bank, DSP, and the Peases contend the reverse stock split was conducted in accordance with K.S.A. 9-904, K.S.A. 17-6602, and K.S.A. 17-6405. K.S.A. 9-904, which is a part of the Banking Code addressing reduction of capital stock, provides in applicable part:

"The capital stock of any bank or trust company may be reduced to the minimum provided by law for a new bank or trust company by resolution adopted by the stockholders representing ⅔ of the voting stock of such bank or trust company, except that no such reduction shall become effective until the board approves the same."

K.S.A. 17-6405, which is part of the General Corporation Code addressing fractional shares, reads in pertinent part:

"A corporation may issue, but shall not be required to issue, fractions of a share . . . . If it does not issue fractions of a share, it shall . . . pay in cash the

fair value of fractions of a share as of the time when those entitled to receive such fractions are determined . . . ." .

K.S.A. 17-6602, which is also part of the General Corporation Code and which is the principal provision at issue in the questions submitted, addresses how corporations may amend their articles of incorporation and states in relevant part:

"(a) After a corporation has received payment for any of its capital stock, it may amend its articles of incorporation . . . . In particular, and without limitation upon such general power of amendment, a corporation may amend its articles of incorporation, from time to time, so as:

. . . .

(3) to increase or decrease its authorized capital stock or to reclassify the same, by changing the number . . . of the shares . . . .

. . . .

"(c) . . . every amendment authorized by subsection (a) shall be made and effected in the following manner:

. . . .

(2) The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the provisions of the articles of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences or special rights of the shares of such class so as to affect them adversely. If any proposed amendments would alter or change the powers, preferences or special rights of one or more series of any class so as to affect them adversely, but shall not so affect the entire class, then only the shares of the series so affected by the amendment shall be considered a separate class for the purposes of this paragraph. The number of authorized shares of any such class or classes of stock may be increased or decreased, *but not below the number of shares then outstanding,* by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote, if so provided in the original articles of incorporation or in any amendment thereto which created such class or classes of stock or in any amendment thereto which was authorized by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock." (Emphasis added.)

The Acheys challenge the legality of the reverse stock split based upon the clause of K.S.A. 17-6602(c)(2) emphasized above.

Under the Bank, DSP, and the Peases' construction of K.S.A. 17-6602(c)(2), the wording of limitation on the reduction of authorized shares only applies to corporations having more than one

class of stock. They contend the K.S.A. 17-6602(c)(2) statutory protection applies only if the stockholder action adversely affects the rights of one class or series of stock. Additionally, they maintain that even if the Acheys could avail themselves of this protection, the statute only guarantees the right to vote as a class and not the right to veto the reverse stock split, citing 1 Logan, Martin & Ray, Kansas Corporation Law and Practice § 4.66 (3d ed. 1988) as authority for their contention.

The Acheys assert K.S.A. 17-6602 "clearly" precludes majority shareholders from enacting an amendment that would have the effect of eliminating minority shareholders. The Acheys dispute that K.S.A. 17-6602(c)(2) only applies to corporations having more than one class of stock, arguing that if that was the legislature's intent, the legislature could have so stated. For example, they emphasize that 17-6602(c)(1) begins with the phrase "If the corporation has capital stock," and 17-6602(c))(3) begins "If the corporation has no capital stock," and conclude, similarly, that 17-6602(c)(2) could have begun with the phrase "If the corporation has more than one class of stock," if that had been the legislature's intent. According to the Acheys, K.S.A. 17-6602(c)(2) does apply to any corporation, such as the Bank, having only one class of stock. Additionally, the Acheys disagree that the Logan, Martin & Ray Treatise supports the majority shareholders' construction.

We commence our analysis by restating our basic rules of statutory construction as set forth in *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992):

"Interpretation of statutes is a question of law. The function of the court is to interpret the statutes, giving the statutes the effect intended by the legislature. *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 719, 792 P.2d 971 (1990).

" 'As a general rule, statutes are construed to avoid unreasonable results. *Wells v. Anderson*, 8 Kan. App. 2d 431, 659 P.2d 833, *rev. denied* 233 Kan. 1093 (1983). There is a presumption that the legislature does not intend to enact useless or meaningless legislation. [Citation omitted.]' *City of Olathe v. Board of Zoning Appeals*, 10 Kan. App. 2d 218, 221, 696 P.2d 409 (1985).

" 'A construction of a statute should be avoided which would render the application of a statute impracticable or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance

of an impossible act.' *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 8, 643 P.2d 168 (1982). See 73 Am. Jur. 2d, Statutes § 251.

" 'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.' *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989).

" '[T]he court must give effect to the legislature's intent even though words, phrases or clauses at some place in the statute must be omitted or inserted.' *Ross*, 245 Kan. at 594.

" 'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia*. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.' *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975)."

No Kansas cases have yet construed K.S.A. 17-6602(c)(2). This statute is patterned after Del. Code Ann. tit. 8, § 242(b)(2) (1991). Oklahoma has adopted a similar statute. See Okla. Stat. tit. 18, § 1077(B)(2) (1991). We stated previously in *In re Hesston Corp.*, 254 Kan. 941, 979-80, 870 P.2d 17 (1994), and in *Vogel v. Missouri Valley Steel, Inc.*, 229 Kan. 492, 496, 625 P.2d 1123 (1981), that decisions of the Delaware courts involving corporation law are persuasive, as our General Corporation Code has been patterned after, and at times contains identical provisions of, the Delaware general corporation law. Neither Delaware nor Oklahoma courts have directly addressed the questions certified to us. But, in *Orban v. Field*, a 1993 opinion of the Delaware Chancery Court set out in 19 Del. J. Corp. L. 1275, 1993 WL 547187, a Delaware court described Del. Code Ann. tit. 8, § 242(b)(1) as defining "the procedures for adopting amendments" and Del. Code Ann. tit. 8, § 242(b)(2) as "the mandatory class vote" provision. 19 Del. J. Corp. L. at 1288. The *Orban* court commented, however, that "[t]he jurisprudence of class votes in Delaware is not highly developed. . . . [But] [t]he language of [§ 242(b)(2)] makes clear that it affords a right to a class vote when the proposed amendment

adversely affects the peculiar legal characteristics of that class of stock." 19 Del. J. Corp. L. at 1288.

The Delaware Supreme Court recently discussed Del. Code Ann. tit. 8, § 242(b), but in a different context, in *Williams v. Geier*, 671 A.2d 1368, 1382 (Del. 1996) (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 [Del. Super. 1985]). The court concluded that even if "there is a controlling stockholder or a controlling bloc, there is no requirement under Delaware General Corporation Law that the transaction be structured or conditioned so as to require an affirmative vote of a majority of the minority group of outstanding shares." 671 A.2d at 1382.

Kansas amended 17-6602(b)(2) in 1988 to include the language "but not below the number of shares then outstanding" after Delaware had similarly amended its statutes in 1981. See L. 1988, ch. 99, § 35; L. 1988, ch. 100, § 35; and 63 Del. Laws, ch. 25, § 12 (1981). In 1995, a new subsection (b) was added by the Kansas Legislature, and the former subsection (b) became subsection (c). See. L. 1995, ch. 86, § 1.

1 Logan, Martin & Ray, Kansas Corporation Law and Practice § 4.66, in discussing these provisions, states:

"Unless the articles of incorporation provide otherwise, a majority of the stockholders entitled to vote, as well as a majority of the stockholders entitled to vote as a class, must approve the proposed amendment. K.S.A. 17-6602[c](1). The holders of outstanding stock of a class may vote as a class, whether or not entitled to vote thereon by the provisions of the articles of incorporation, 'if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the par value of such class, or alter or change the powers, preferences or special rights of the shares of such so as to affect them adversely.' K.S.A. 17-6602[c](2). Where any proposed amendment would adversely alter or change the powers, preferences or special rights of one or more series of any class, then that series shall be considered to be a separate class where the entire class would not be adversely affected. K.S.A. 17-6602[c](2). When the articles of incorporation provide for a greater-than-majority vote by either the directors of the stockholders or a class or series of the stockholders, then such a provision cannot be amended except by such greater vote. K.S.A. 17-6602[c](4)

. . . .

"Despite the foregoing limitations upon the power to amend the articles of incorporation, it may not always be possible to protect certain stockholders from the adverse effects of an amendment. The protection of a class or series vote offered by K.S.A. 17-6602[c](2) applies only when the class or series itself would

be adversely affected due to a change in the rights of the stock of that class or series. Arguably, K.S.A. 17-6602[c](2) offers protection only in the situation where a class or series of stockholders will be directly and adversely affected by a change in the rights of their own stock, not when they are adversely affected merely because other stockholders are given greater rights. *See Hartford Accident & Indemnity Co. v. W. S. Dickey Clay Mfg. Co.,* 26 Del. Ch. 411, 24 A.2d 315 (Sup. Ct. 1942)."

The meaning of these statements is not as obvious as either party contends. However, read in its entirety, the passage seems to give more credence to the contention of the majority shareholders that the particular wording of 17-6602(c)(2) grants statutory protection to shareholders of one or more classes of stock which would be adversely affected by the proposed reduction in authorized shares, notwithstanding particular provisions existing in the articles facing amendment.

In Vernon's treatise on the Kansas General Corporation Code, the comments regarding K.S.A. 17-6602(c)(2) note:

"[A] provision was inserted which precludes the stockholders from decreasing the number of authorized shares of any class or classes of stock affected by an amendment to the articles of incorporation below the number of shares of such class or classes then outstanding. Such amendment is within the context of the existing requirement that, if a proposed amendment would alter or change the powers, preferences or special rights of one or more series of any class of stock so as to affect such holders adversely, but to not so affect the entire class, the holders of such series of stock shall be deemed a separate class and be allowed to vote on the proposed amendment, irrespective of whether such stockholders would otherwise be entitled to vote on the amendment." 14 Vernon's Kansas General Corp. Code § 17-6602, Author's Comments, pp. 156-57 (1996 Supp.).

This wording is again not crystal clear. But, if applied as the Acheys desire to a corporation with a single class of stock, a reverse stock split would be effectively prohibited. If the wording is intended to relate to multiple classes or series of stock, it substantiates and upholds the position of the Bank, DSP, and the Peases.

When the new provision was enacted, it was deemed necessary only because of a comparable amendment to K.S.A. 1987 Supp. 17-6401(g) concerning so called "blank check" stock, where the power to designate the terms and conditions of stock to be issued is granted to the directors and those terms are not set forth in the

articles of incorporation. Denton B. Rice, then Deputy Assistant Secretary of State—Legal Counsel, commented in *Teaching an Old Dog New Tricks: Recent Amendments to the Kansas General Corporation Code*, 57 J.K.B.A. 19, 22 (Aug./Sept. 1988):

"Due to a change in K.S.A. 1987 Supp. 17-6401(g) concerning increases or decreases in the number of shares of a class or series, an analogous amendment has been adopted to make clear that any amendment decreasing the number of authorized shares may not decrease the number below the number of shares of the class then outstanding."

Rice went on to conclude:

"Although substantial changes have been made to the section to delete the filing, publication and stockholder vote requirements, the substantive requirements of the section have remained unchanged."

This statement is not indicative that the statutory amendment was designed to severely limit or prohibit a reverse stock split. This explanation lends itself most favorably to the claim that the wording of limitation upon which the Acheys rely was placed in the statute only in response to a similar amendment to the wording of 17-6401(g) and was not intended to apply to a corporation with a single class of stock so as to prohibit reverse stock splits.

In considering this question, we have also examined numerous commentaries relating to Delaware corporate practice. When a corporation desires to amend its articles of incorporation, Balotti & Finkelstein, The Delaware Law of Corporations and Business Organizations § 8.1 (2d ed. 1995 Supp.), relates: "After a corporation has received payment for its stock, Section 242 of the General Corporation Law requires that the amendment first be proposed by the directors and then approved by the stockholders entitled to vote thereon." The authors in § 8.10, of the supplement further explain:

"In addition, however, Section 242(b)(2) of the General Corporation Law grants the right of a class vote in the circumstances set forth in that section, whether or not any such class vote is afforded under the terms of the certificate of incorporation.

"Section 242(b)(2) confers upon a class the right to vote separately upon an amendment in three instances: (1) if the amendment would increase or decrease the aggregate number of authorized shares of the class; (2) if the amendment

would increase or decrease the par value of the shares of the class; or (3) if the amendment would alter or change the powers, preferences or special rights of the shares of such class so as to affect them adversely. In the third instance, if the amendment would not affect the entire class, then only the shares of the series so affected would be considered the separate class. In all or any of these cases, approval by a majority of each class affected is required for approval of the amendment.

"Section 242(b)(2) provides that the right to a class vote in the case of an amendment which would decrease or increase the aggregate number of authorized shares of the class may be eliminated by a provision in the certificate of incorporation which authorizes such increase or decrease by the affirmative vote of the holders of a majority of the stock entitled to vote. To be effective as to any class, such provision must be included either in the original certificate of incorporation, in an amendment adopted prior to the issuance of any shares of the class, or in an amendment authorized by resolution adopted by the affirmative vote of a majority of the class.

"The position of a class or series of shares as related to other classes or series is not a power, preference or special right of the shares, so that the provisions granting a class vote where the powers, preferences, or special rights of a class or series are affected adversely do not apply to an amendment which creates a class or series with rights, power and preferences prior to those of one or more existing classes or series of stock. Additionally, a charter provision granting a class vote to the holders of a series of preferred in the event of an adverse change in the terms of the preferred by charter amendment 'or otherwise' does not give the holders a class vote on a merger which extinguishes the preferred in exchange for cash."

Balotti & Finkelstein note in § 8.10 that the Delaware Chancery Court in *Orban v. Field* has recognized that " '[t]he jurisprudence of class votes in Delaware is not highly developed.' " It then quotes the *Orban* court's conclusion that " '[t]he language of [§ 242(b)(2)] makes clear that it affords a right to a class vote when the proposed amendment *adversely affects the peculiar legal characteristics of that class of stock.*' "

This discussion again centers around the relative rights of classes of stock and series of stock within a class. It gives no indication that the addition of the wording of limitation in the Delaware and the Kansas Corporation Codes relied upon by the Acheys was intended to effectively prohibit reverse stock splits under the circumstances existing in this case.

Drexler, Black & Sparks, Delaware Corporation Law and Practice § 32.05[2] (1996), in discussing stock splits and reverse splits, makes the following declaration:

"[A]ll splits, no matter what size, are stock changes which require amendment of the charter pursuant to Section 242. . . .

"The antipode of the stock split is the amalgamation of shares by reclassification, known in the vernacular as the 'reverse split.' In a reverse split, outstanding shares of stock are changed into a smaller number of shares of higher par value. Reverse splits are useful to corporations which see merit in increasing the trading price of their outstanding shares. An additional utility of the reverse split flows from the operation of Section 155, which permits a corporation to decline to issue fractional shares. For example, a 1 for 100 reverse split reduces all holdings of less than 100 current shares to less than one reclassified share, a fraction which may be dealt with by one or more of the means authorized by Section 155. Thus, a reverse split permits a corporation to consolidate its ownership into the hands of its major holders, while removing the smaller holders from their equity position. Such a reclassification can be a method for 'going private,' but as often the objective of a reverse split is to reduce the expense of routine stockholder communications and to make the corporation more desirable as a potential merger partner by cashing out small holdings."

Again, in analyzing the references set forth in this treatise, there is no statement, consideration, or even a hint that the utilization of a reverse split with its attendant corporate advantage was limited or in fact totally restricted where only a single class of stock has been issued.

Another treatise dealing with the rights of minority shareholders, O'Neal & Thompson, Oppression of Minority Shareholders § 5:10 (2d ed. 1996), after describing the typical reverse split and the cashing out of fractional shares, states:

"The California Corporation Code is unusual among state statutes in that it limits this kind of squeeze-out. The Code permits a corporation to pay cash for fractional shares but adds a proviso that a corporation may not do so if such action would result in the cancellations of more than 10 per cent of the outstanding shares of any class. The provision is designed to prevent the use of a reverse stock split unless the majority owns at least 90 percent of the shares."

Cited in the O'Neal & Thompson discussion is a leading Illinois case, *Teschner v. Chicago Title & Trust Co.*, 59 Ill. 2d 452, 322 N.E.2d 54 (1974). The *Teschner* court held that under the Illinois Business Corporation Act, Chicago Title was authorized to amend its articles, reclassify its shares, and purchase its own shares for the purpose of eliminating fractional shares.

Dykstra, *The Reverse Stock Split—That Other Means of Going Private*, 53 Chi.-Kent L. Rev. 1 (1976), describes the reverse split as a method of going private, in addition to other procedures, such as a cash tender offer, a merger to a corporation controlled by management, or an exchange offer. This discussion comments on the requirement of obtaining the approval of the classes involved, but was written prior to the amendments of the Delaware and Kansas Corporation Codes at issue in this case.

Another article on reverse stock splits, Kaplan & Young, *Corporate "Eminent Domain": Stock Redemption and Reverse Stock Splits*, 57 UMKC L. Rev. 67 (1988), discusses the entire procedure in detail. Most helpful to the majority shareholders, it noted: "No jurisdiction has any per se rule against squeeze-outs by means of reverse stock splits or otherwise, but majority shareholders must meet certain standards of fairness in their treatment of the minority." 57 UMKC L. Rev. at 74 (citing *Lerner v. Lerner*, 306 Md. 771, 511 A.2d 501 [1986]).

In answering the certified questions, we are not called upon to decide the necessity of a valid business purpose, the amounts to be paid for the stock, or the other issues that may still exist in this case, which are addressed in considerable detail by the two law review articles referred to above.

The memorandum and order from the United States District Court recognized the majority shareholders' contention that other jurisdictions permit reverse stock splits, citing *Laird v. I.C.C.*, 691 F.2d 147, 151 (3d Cir. 1982), *cert. denied* 461 U.S. 927 (1983) (finding reverse stock split legal under Missouri law); *Goldman v. Union Bank and Trust*, 765 P.2d 638 (Colo. App.), *cert. denied* December 19, 1988 (deciding Colorado Corporation Code authorizes reverse stock split that 'froze out' minority stockholders); *FGS Enterprises, Inc. v. Shimala*, 625 N.E.2d 1226 (Ind. 1993) (ruling Indiana General Corporation Act permits stock splits in which corporation acquired fractional shares). We do not question these opinions, although we do not find them persuasive in this case because they appear to be decided pursuant to state statutes with provisions differing from those in Kansas.

Our examination of all of the authorities leads us to conclude they are unanimous against adopting the interpretation of the Kansas Corporation Code suggested by the Acheys.

The wording relied upon by the Acheys appears to relate to votes involving more than one class of stock or blank check stock under the corresponding provisions of K.S.A. 17-6401(g). Such is not the case in the present situation involving only one class of stock. Based on this analysis, we are compelled to answer the first question proposed to us by the United States District Court in the negative.

In addition to the above analysis, if we attempt to analyze K.S.A. 17-6602 by applying our basic rules of statutory construction stated earlier, we reach an identical result.

The limitation the Acheys wish to recognize does not have any support in subparagraph (a) of K.S.A. 17-6602, which literally says "a corporation may amend its articles of incorporation . . . so as: . . . (3) to increase or decrease its authorized capital stock or to reclassify the same by changing the number . . . of the shares." Subsection (a) must be construed as the general grant of authority to the duly authorized directors and the shareholders to take the action which has been approved by the majority of the shareholders in this case.

Subsection (c) of 17-6602 is a procedural provision, not one of limitation. It commences by stating: "[E]very amendment authorized by subsection (a) shall be made and effected in the following manner." Subparagraph (1) of 17-6602(c) requires affirmative action of the directors and then an affirmative vote of the stockholders to adopt an amendment, which must be set forth in a certificate, filed, and recorded in accordance with K.S.A. 17-6003.

Subparagraph (2) of 17-6602(c), which is at the heart of our controversy, is obviously intended to relate to class voting, for the first sentence grants a "vote as a class," even if a class vote was not provided for in the articles of incorporation, if the amendment would "affect them [the class shareholders] adversely."

The second sentence of subparagraph (2) states that if there are one or more series of any class of stocks which would be adversely affected, the series so affected shall be treated as a separate class.

This supports the reading of the authorities that 17-6602(c)(2) relates to voting by classes or series of stock within a class.

It would be totally illogical to then jump to the third sentence of subparagraph (2), the sentence primarily involved in this case, and hold that it applies to a corporation with a single class of stock and accomplishes the limitation asserted by the Acheys in this case. The more logical reading of the third sentence of subparagraph (2) of 17-6602(c) is that it applies in the context of several classes of stock and prevents the vote of the members of one class from affecting the rights of members of a different class.

Whether we limit the wording of 17-6602(c)(2) at issue herein as relating to either blank check stock or more than one class of stock, we would not apply it to the single class of stock of the Bank or prohibit the reverse stock split in this case.

Again, the first question propounded to us must be answered in the negative.

Having answered the first question negatively, it is not necessary to extensively discuss the second question, for it logically follows that it must also be answered in the negative.