No. 88,582

J. Thomas Burcham; John D. Hunkeler, M.D.; J. Peter Gattermeir, as Trustee of the J. Peter Gattermeir Revocable Trust, Laura C. Gattermeir Revocable Trust, and Amy S. Gattermeir Revocable Trust; Barbara J. Gattermeir, as Trustee of the Barbara J. Gattermeir Revocable Trust; Thomas A. McDonnell; and Jean Weitkamp McDonnell, *Appellants,* v. Unison Bancorp, Inc., and Stephen D. Bunten, *Appellees.*

(77 P.3d 130)

Opinion filed September 26, 2003.

*John L. Vratil*, of Lathrop & Gage, L.C., of Overland Park, argued the cause, and *C. David Barrier*, was with him on the briefs for appellants.

*Michael E. Waldeck*, of Niewald, Waldeck & Brown, P.C., of Kansas City, Missouri, argued the cause, and *Laura T. Goettsch*, of the same firm, was with him on the brief for appellee Unison Bancorp, Inc.

*Spencer J. Brown*, of Deacy & Deacy, L.L.P., of Kansas City, Missouri, argued the cause, and *Dale L. Beckerman*, of the same firm, was with him on the brief for appellee Stephen D. Bunten.

The opinion of the court was delivered by

LUCKERT, J.: Plaintiffs, minority stockholders of Unison Bancorp, Inc. (Unison), filed a four-count petition alleging that Unison breached a Stockholders' Agreement; that Unison and Stephen D. Bunten, Unison's president and a member of the board of directors, tortiously interfered with a contract for sale of plaintiffs' Unison shares to Gold Banc, Inc. (Gold); that Unison and Bunten

tortiously interfered with plaintiffs' business expectancy in that sale; and that Unison and Bunten breached a fiduciary duty owed to plaintiffs. Plaintiffs appeal from the district court's order denying them summary judgment on the first count and granting summary judgment in favor of the defendants on all four counts.

We affirm the trial court's decision to grant defendants' and deny plaintiffs' motions for summary judgment on Count I, breach of contract, and to grant defendants' motion for summary judgment on Count II, tortious interference with a contract. We also affirm the trial court's decision to grant summary judgment in favor of Unison on the breach of fiduciary duty claim, Count IV. However, we reverse the granting of defendants' motions for summary judgment on the claim of interference with plaintiff's business expectancy, Count III, and on the breach of fiduciary duty claim against Bunten, Count IV.

## FACTS

Plaintiffs J. Thomas Burcham, Dr. John Hunkeler, Peter and Barbara Gattermeir (as trustees), and Tom and Jean McDonnell are minority stockholders of defendant Unison Bancorp, Inc., collectively owning a total of 8.07% of Unison's shares of common stock. Burcham also holds an option to purchase an additional 2,500 shares. Unison is a bank holding company which owns all the outstanding shares of stock of Western National Bank. Defendant Stephen D. Bunten is president and chief executive officer of Unison and Western National Bank.

Malcolm Aslin was instrumental in the formation of Unison. Aslin was initially chairman of the board of Unison, but left that position in 1999 to serve as president of another holding company, Gold Banc, Inc. Aslin owns 2.75% of Unison's outstanding stock.

Gold became a Unison stockholder in 1998 when Unison obtained financing from Gold in order to acquire the Burlington Bank. Gold owns 4.62% of Unison's outstanding stock.

All of the plaintiffs are parties to a Stockholders' Agreement with Unison. The Stockholders' Agreement and Offering Circular describing it explain the restrictions on a stockholder's transfer of shares. Additionally, the Stockholders' Agreement requires a stock-

holder who plans to transfer stock to notify Unison and the other stockholders. Upon receipt of the notice the company has the option to purchase the shares. If the company does not exercise the option, the other stockholders may exercise their options. There are further restrictions if the sale results in change of control.

The Stockholders' Agreement defines a "change of control" as any person or group of persons acquiring 35% or more of the outstanding shares of Unison. Under section 2.7(b) of the Stockholders' Agreement, if a proposed sale involves a change of control, all of the other stockholders must be given the opportunity to sell their shares at the same price and pursuant to the same terms and conditions or a majority of the stockholders must approve the sale.

Since its formation in 1995, several offers have been made to purchase Unison. Plaintiff Burcham, who controls Missouri Bank and Trust, made two offers to purchase Unison before 1998, but both offers were refused. Gold also made two offers to purchase Unison, one in 1998 while Aslin was on the Unison board and one in 1999 after Aslin had left Unison to join Gold. The Unison board unanimously rejected both offers. According to Aslin, after one of the offers from Unison, Bunten met with Aslin and requested a 5-year personal compensation package from Gold if there was an acquisition by Gold. Aslin declined the proposal.

In 1999, after Unison had rejected Gold's second offer, plaintiff Burcham contacted Aslin to see if Gold would be interested in purchasing his Unison shares. After Burcham and Aslin reached an agreement, the other plaintiffs who were friends of Burcham asked to be included in the deal, and Aslin agreed. By letter dated September 17, 1999, Aslin offered $21 per share for all of plaintiffs' Unison stock including the 2,500 shares on which Burcham held an option.

In the letter, Gold confirmed that the purchase of plaintiffs' shares would not result in a "change of control" as defined in the Unison Stockholders' Agreement. The letter also provided that the sale was subject to several conditions including that (1) Unison and its other stockholders did not exercise their rights to purchase the stock as provided in the Stockholders' Agreement, (2) Gold obtained approval of the Federal Reserve for the acquisition of the Unison shares, (3) the representations and warranties made by the

plaintiffs remained true and correct at the closing date, and (4) no material adverse change in Unison or Western National Bank occurred.

The plaintiffs notified Unison and provided written copies of their letter agreements to sell their Unison stock to Gold. Neither plaintiffs nor Unison ever notified the other stockholders of the proposed sale.

Unison's counsel Edward Dolson responded to plaintiffs by letter, informing them that Unison had no obligation to exercise its right to purchase their shares because Gold's offer was not a "fixed, unconditional offer." Dolson stated that Unison would not consider whether to exercise its right of first refusal until Gold had obtained Federal Reserve approval and had waived the "material adverse change" condition of the agreement.

The minutes of the November 1999 board meeting show that Bunten reported on Gold's conditional offer to buy plaintiffs' shares. Bunten informed the board that, because the offer was conditioned upon Federal Reserve approval, no action by Unison was required. The January 2000 board minutes show that Bunten reported Gold's application to the Federal Reserve for approval of its purchase of the Unison shares. Bunten recommended that if the Federal Reserve approved the transaction and Unison was faced with the decision whether to buy the shares that Unison not do so. The board unanimously agreed to adopt that policy. In general, the board believed the $21 price per share to be too high.

Shortly after receiving notice from the plaintiffs of the proposed sale of their shares to Gold, Dolson contacted a St. Louis attorney to draft a stockholders' rights plan or "poison pill." According to the summary of the plan, the purpose was to protect the company and its stockholders from unwanted takeover bids. When the plan's provisions are triggered, all of the stockholders, other than the takeover bidder, are issued rights to acquire additional stock for nominal consideration. This has the effect of shifting negotiations regarding the transaction from the individual stockholders to the board. Under the plan adopted by Unison, the triggering event was a person acquiring or agreeing to acquire 20% ownership of the company. According to Dolson, the board intentionally set the trig-

ger point high enough so that the plan's provisions would not be triggered by the proposed sale to Gold of the plaintiffs' 8% ownership.

Unison adopted its Stockholder Rights Plan (Rights Plan), or poison pill, on December 16, 1999. Shortly thereafter, Unison informed its stockholders of the new Rights Plan by letter. Several Unison directors testified in their discovery depositions that the board adopted the Rights Plan, in part, because of a perception that Gold intended a hostile takeover of Unison. At least one director believed Gold was planning to file an application for Federal Reserve approval which would involve a change of control of Unison. However, according to the deposition testimony of the directors, the Rights Plan was not intended or expected to frustrate Gold's purchase of only the plaintiffs' 8% ownership.

On January 12, 2000, Gold filed an application for Federal Reserve approval of a proposal to acquire at least 33.33% of Unison's outstanding stock. The application also stated that Gold was seeking approval of "the acquisition by [Gold] of direct ownership to vote 100% of the voting shares" of Western National Bank and Unison. However, the notice published in the *Federal Register* stated that Gold had applied to acquire 33.33% of the voting shares of Unison and thereby to acquire indirect control of Western National Bank.

Former Gold board member, Keith Bouchey, testified in his deposition that Gold applied for 33⅓% so that Gold would not have to file another application if Unison stockholders other than plaintiffs were willing to sell. Aslin had prepared a list of other Unison stockholders from whom more stock might be acquired. The list was shared with the Federal Reserve but kept confidential because none of the stockholders had been contacted.

Bunten interpreted Gold's application as showing Gold's intent to take control of Unison and believed Gold's purchase of plaintiffs' 8% was only the first step toward taking control. Dolson also believed that Gold had hostile motives toward Unison for a variety of reasons including: Aslin's comment to Bunten that Gold was going to make a market in Unison's stock; Gold's action of acquiring banks on a regular basis; Gold's two previous offers to acquire

Unison; and plaintiff Burcham's statement to Dolson that Gold was going to acquire Unison. Dolson also reviewed the letter agreement between Burcham and Gold which provided that, if Gold were to acquire all of the remaining Unison shares within a specified time period, plaintiffs would be entitled to the difference between the average price per share paid for the remaining shares and the $21 price paid to plaintiffs. When Gold filed its application for Federal Reserve approval to purchase at least 33.33% of Unison's shares, with a reference to acquisition of 100% of the shares, that confirmed Dolson's earlier belief that Gold had hostile intentions.

On February 2, 2000, Dolson sent a letter to Aslin indicating that the Unison board intended to file a protest with the Federal Reserve and would "strongly oppose any attempt by Gold to acquire any further shares of Unison" unless "certain agreements" could be reached between Unison and Gold. The letter stated that Unison's Rights Plan would be triggered "in the event Gold attempts to acquire more than 20% of Unison's outstanding stock."

The letter went on:

"Further, certain rights of Unison and stockholders under the Kansas Control Share Acquisition Act (the 'Act') are triggered in the event Gold has plans, as stated in its recent Application to the Federal Reserve, to purchase up to 33.3% of the outstanding stock of Unison. If Gold persists with this plan, Unison will invoke all of the protective measures available to it under the Rights Agreement and Kansas Control Share Acquisition Act. Further, even if the Federal Reserve approves Gold's Application over Unison's Protest, such approval would not affect Unison's rights under the Rights Agreement or applicability of the Act. *Further, Unison would have the right to take the position that no signatory to the Unison Stockholders Agreement could transfer his/her shares to Gold inasmuch as such purchase would be the first 'step' in a plan as enunciated to the Federal Reserve, by which Gold and its affiliates and principals holders would own more than 35% of the outstanding stock of Unison.*" (Emphasis added.)

Finally, the letter stated that Unison representatives were willing to meet with Aslin to discuss the following points:

"1. Gold's entering into a standstill agreement with Unison as to further attempts to acquire Unison stock;
"2. Gold's agreement to establish a voting trust for any shares of Unison owned by it;

"3. Consideration of Unison's repurchase of shares of Unison currently held by Gold and its principals and affiliates; and

"4. Withdrawal of Unison position [regarding] Gold Application with Federal Reserve."

On February 8, 2000, Bunten filed a letter on behalf of Unison asking the Federal Reserve to deny Gold's application.

On February 9, 2000, after several telephone conversations with Dolson, Gold's counsel Michael Lochmann responded in writing to Dolson's letter. Lochmann's letter stated that Gold considered Unison's protest letter to be libelous and that Gold believed the Unison board had breached its fiduciary duty to its stockholders by adopting the Rights Plan. Gold cited Bunten's desire for self-enrichment as the true reason that Unison had rejected its previous offer to purchase Unison. Gold refused to enter into a standstill agreement, to establish a voting trust, or to sell its Unison stock. The letter also mentioned that, in addition to plaintiffs, other Unison stockholders had approached Gold seeking to sell their Unison shares.

That same day, Gold withdrew its application for Federal Reserve approval of its purchase of Unison shares. On February 15, 2000, Gold notified plaintiffs that it would not purchase plaintiffs' shares. Aslin's letter stated that the Unison board's adoption of a Rights Plan constituted a "material adverse change" in Unison; therefore, the conditions of closing could not be met. Aslin also cited Dolson's letter threatening to refuse to transfer any Unison stock to Gold.

In April 2000, plaintiffs filed suit against Unison and Bunten. Count I of the petition alleged that Unison breached the Stockholders' Agreement. Count II alleged that Unison and Bunten tortiously interfered with plaintiffs' contracts to sell their shares to Gold by breaching the Stockholders' Agreement, adopting the Rights Plan, and making unauthorized threats and demands against Gold in connection with its Federal Reserve application. Count III alleged that Unison and Bunten tortiously interfered with plaintiffs' business expectancy based upon the same conduct. Count IV alleged that Unison and Bunten breached their fiduciary duty to plaintiffs.

The plaintiffs filed a motion for partial summary judgment on Count I. After discovery, Bunten and Unison each filed motions for summary judgment. The district court denied plaintiffs' motion. The court then granted defendants' motions for summary judgment on all four counts. The court found that Unison had not breached the Stockholders' Agreement and that any interference with plaintiffs' planned sale of stock to Gold was not tortious interference and was not a breach of fiduciary duty. The court also found that the actions of Bunten and Unison "all bore a relationship to a legitimate business purpose." Plaintiffs timely appealed. Pursuant to K.S.A. 20-3018(c), the appeal was transferred to this court on our motion.

*Issue 1: Did the District Court Make Sufficient Findings of Fact and Conclusions of Law as Required by K.S.A. 2002 Supp. 60-252(a) and Rule 165?*

Plaintiffs' first argument on appeal is that the district court's summary judgment rulings should be reversed because the court failed to make specific findings of fact and conclusions of law as required by K.S.A. 2002 Supp. 60-252(a) and Supreme Court Rule 165 (2002 Kan. Ct. R. Annot. 200). K.S.A. 2002 Supp. 60-252(a) requires the court to find and state, either orally or in writing, the controlling facts and conclusions of law. Rule 165 provides in relevant part: "In all contested matters submitted to a judge without a jury including motions for summary judgment, the judge shall state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision." (2002 Kan. Ct. R. Annot. 200.)

Although the journal entry itself contains minimal findings, the court's ruling from the bench does clarify some of the reasons for the court's decision. Essentially, where the district court addressed an issue, its findings are adequate; however, on some issues, the court made no findings at all.

However, plaintiffs made no objection to the trial court's findings. "[A] litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal." *Hill v. Farm Bur. Mut. Ins.*

*Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998). Plaintiffs could have filed a motion pursuant to K.S.A. 2002 Supp. 60-252(b) for additional findings, and they could have objected to the journal entry pursuant to Supreme Court Rule 170 (2002 Kan. Ct. R. Annot. 205); they did neither.

Furthermore, because this court reviews summary judgment de novo, the inadequacy of some of the trial court's findings does not preclude effective appellate review.

*Issue 2: Did the District Court Err in Granting Summary Judgment in Favor of Unison on Count I Alleging Unison's Breach of the Stockholders' Agreement?*

Plaintiffs argue that the district court erred in denying them summary judgment and in granting summary judgment in favor of Unison on Count I. In Count I, plaintiffs alleged that Unison breached the Stockholders' Agreement (1) by failing to exercise its option to purchase plaintiffs' shares or to notify other stockholders of their right to purchase the plaintiffs' shares, (2) by stating in a letter of February 2, 2000, from attorney Dolson that "Unison would have the right to take the position that no signatory to the Unison Stockholders Agreement could transfer his/her shares to Gold inasmuch as such purchase would be the first 'step' . . . by which Gold and its affiliates and principal holders would own more than 35% of the outstanding stock of Unison"; and (3) by adopting the Rights Plan with the intent to preclude plaintiffs' sale of their shares to Gold.

In denying plaintiffs' motion for summary judgment, the district court found that plaintiffs' agreement to sell their shares to Gold was conditioned upon Federal Reserve approval; therefore, Unison had no obligation under the Stockholders' Agreement to exercise its right to purchase the plaintiffs' shares at that time. Nor did Unison have any obligation to notify other stockholders of their right to purchase plaintiffs' shares.

In granting Unison's motion for summary judgment on Count I, the district court ruled that there was "no genuine dispute as to the breach of the contract by the defendant as pertains to Article II of the stockholders' agreement" and that "there was, in fact, no

breach . . . ." The court made no specific finding or ruling regarding plaintiffs' contention that Unison's adoption of the Rights Plan, or "poison pill," constituted a breach of the Stockholders' Agreement.

## Standard of Review

The standards governing the consideration of summary judgment motions are well developed and require no elaborate restatement. Essentially, summary judgment should not be granted if there is a genuine issue as to any fact that is material to the conclusive issues in the case. In making this assessment, the trial and appellate courts must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. " 'When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact.' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

## The Stockholders' Agreement

Plaintiffs first argue that the district court's ruling that Unison had no obligation under the Stockholders' Agreement to act upon its first right to purchase plaintiffs' shares until the Federal Reserve approved plaintiffs' sales to Gold was erroneous as a matter of law. Unison contends their first right to purchase was not triggered because Gold's offer was conditional and could have been withdrawn.

This issue involves interpretation of the Stockholders' Agreement. "The legal effect of a written instrument is a question of law for the court to decide. On appeal, a written instrument or contract may be construed and its legal effect determined by the appellate court regardless of the construction made by the trial court. [Citation omitted.]" *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 486, 15 P.3d 338 (2000).

This court previously recognized the validity of stockholders' agreements, but stated that restrictions on transfer are looked upon with disfavor and are to be strictly construed.

"We have recognized the general rule that reasonable restrictions upon a stockholder's right to transfer his corporate stock may be imposed by the articles of incorporation or by the agreement of the stockholders themselves. [Citation omitted.] The purpose of a first-option provision is to prevent or discourage a sale of stock to outsiders so as to preserve the continuity of management. Such provisions, however, are generally regarded with disfavor and are strictly construed." *Thompson v. Anderson*, 209 Kan. 547, 555, 498 P.2d 1 (1972).

It is within this context that we consider the provisions of the Unison Stockholders' Agreement. The Stockholders' Agreement provides:

"§ 2.1 <u>Options of the Company and Other Stockholders</u>. In the event a Stockholder proposes a Transfer [of] all or any part of the shares then owned by such Stockholder (a 'Disposing Stockholder'), including shares now owned or hereafter acquired or re-acquired (the 'Subject Shares'), the Disposing Stockholder shall notify the Company and the other Stockholders party to this Agreement (the 'Other Stockholders') of such proposed transfer pursuant to § 2.3 hereof (the 'Transfer Notice').

"Upon receipt of the Transfer Notice (or immediately upon the occurrence of an attempted Transfer), the Company and the Other Stockholders shall have the option to purchase the 'Subject Shares' in the following order of priority: (i) the Company shall have the first option to purchase all or any portion of the Subject Shares; and (ii) in the event the Company does not exercise its option under this section or exercises its option as to less than all of the Subject Shares, the Other Stockholders shall have the option to purchase all or any portion of the Subject Shares not purchased by the Company. . . . Notwithstanding anything herein to the contrary, a sale of shares to the Company or to stockholders of the Company, (whether or not a party to this Agreement) which results in a Change of Control shall not be effective unless made in compliance with §2.7(b) hereof.

. . . .

"§ 2.3 <u>Disposing Stockholder's Notice</u>. The Transfer Notice shall notify the Company and the Other Stockholders of any proposed Transfer, and shall state the number of Subject Shares to be transferred, the terms and conditions of the sale, the name of the transferee . . . and copy of any bona fide offer made by a third party purchaser."

Under § 2.4 of the Stockholders' Agreement, Unison had 20 days after receipt of the Transfer Notice to exercise its option to purchase the shares. If it chose not to exercise its option, it was then required to notify the other stockholders so that they could decide whether to purchase the shares.

The Stockholders' Agreement also contains the following provision regarding Federal Reserve approval of stock transfers:

"§ 4.15 Regulatory Approval. Notwithstanding anything herein to the contrary, during the period that the Company is registered as a bank holding company with the Board of Governors of the Federal Reserve System ('FRB'), no sale or transfer of shares shall be effective until approval of the FRB, if applicable, has been obtained. All time limits herein regarding notice, response, closing and the like shall be equitably adjusted pending such approval so as to give effect to the purposes of this Agreement."

When plaintiffs notified Unison of the proposed sales and provided copies of their letter agreements with Gold, Unison adopted the position that it had no obligation to exercise its right to purchase their shares because Gold's offer was not a "fixed, unconditional offer." Dolson, Unison's counsel, told plaintiffs that Unison would not consider whether to exercise its right of first refusal until Gold had obtained Federal Reserve approval and had waived the "material adverse change" condition of the agreement.

Plaintiffs contend that this position was merely a pretext for Unison's attempt to forestall the sale of shares to Gold. Plaintiffs point out the testimony of various Unison directors that the board actually decided not to purchase plaintiffs' shares because the price per share of $21 was too high. The directors' testimony, however, does not directly contradict Unison's contention that the board only considered whether it *would* purchase the shares *if* Gold obtained Federal Reserve approval.

Furthermore, the material issue is whether Unison's position was a breach of the Stockholders' Agreement. Although the Stockholders' Agreement required Unison to act on its first right of refusal within 20 days after receipt of the Transfer Notice, the Agreement also provided: "All time limits herein regarding notice, response, closing and the like shall be equitably adjusted pending [Federal Reserve] approval so as to give effect to the purposes of this Agreement." Unison's position was consistent with this provision. As Unison points out, it would be illogical to require Unison to match an offer and purchase plaintiffs' shares at a price it would not otherwise have offered when the proposed sale had not been approved by the Federal Reserve and might never actually close.

Plaintiffs also complain that Unison never notified the other stockholders of their option to purchase plaintiffs' shares as required by § 2.4 of the Stockholders' Agreement. Plaintiffs ignore their own obligation to notify the other stockholders under § 2.1 of the Stockholders' Agreement. In any event, because Unison had no obligation to consider whether to exercise its option to purchase plaintiffs' shares until Gold obtained Federal Reserve approval, it had no obligation to notify the other stockholders until after that occurred.

### The Dolson Letter

Next, plaintiffs contend that Unison made "arbitrary and unlawful" threats against Gold. Specifically, they point to Dolson's letter which stated:

"Further, even if the Federal Reserve approves Gold's Application over Unison's Protest, such approval would not affect Unison's rights under the Rights Agreement or applicability of the Act. Further, Unison would have the right to take the position that no signatory to the Unison Stockholders Agreement could transfer his/her shares to Gold inasmuch as such purchase would be the first 'step' in a plan as enunciated to the Federal Reserve, by which Gold and its affiliates and principals holders would own more than 35% of the outstanding stock of Unison."

Plaintiffs contend that Unison's threat to refuse to transfer the shares was not authorized by the Stockholders' Agreement. Unison counters by pointing to § 4.7 which provides:

"Company's Right to Refuse Transfer. The Company is hereby irrevocably authorized by each Stockholder to refuse to make any transfer of shares which would not be in accordance with the terms hereof, and the Company and the officers and directors thereof are hereby released and relieved from any and all liability which might arise from the refusal to make any such transfer, absent fraud or manifest error."

Relying upon this provision in conjunction with the change of control provisions, Unison contends that Dolson's letter was merely a statement of the position Unison might take if Gold was attempting to control 35% or more of Unison's stock. Unison contends the position stated in Dolson's letter was a legitimate interpretation of the contract and was not a clear and unequivocal renunciation sufficient to be considered an anticipatory breach.

An explanation of the distinction between a clear renunciation and a statement of a party's interpretation or assertion of contractual rights was provided in *N.Y. Life Ins. Co. v. Viglas*, 297 U.S. 672, 80 L. Ed. 971, 56 S. Ct. 615 (1936). The United States Supreme Court addressed the question whether an insurance company's *notification* to a policyholder that it would refuse to continue paying disability benefits constituted a breach of the contract. The Court ultimately found that the company's subsequent *action* to stop payment constituted a breach of the agreement, noting that the insurance company's refusal was based on unfounded facts. 297 U.S. at 678. But the Court held that the notification alone did not constitute a breach by repudiation. As Justice Cardozo explained, for a unanimous Court: "Repudiation there was none as the term is known to the law. Petitioner did not disclaim the intention or the duty to shape its conduct in accordance with the provisions of the contract. Far from repudiating those provisions, it appealed to their authority and endeavored to apply them." 297 U.S. at 676.

The Tenth·Circuit Court of Appeals noted that since *Viglas* the law has been settled that "[a]n offer to perform in accordance with the promisor's interpretation of the contract although erroneous, if made in good faith, is not such a clear and unequivocal refusal to perform as amounts to a renunciation giving rise to an anticipatory breach." *Kimel v. Missouri State Life Ins. Co.*, 71 F.2d 921, 923 (10th Cir. 1934). As the Tenth Circuit Court of Appeals explained:

> " 'If this were not the law, it would be a dangerous thing to stand upon a controverted construction of a contract. Every man would act at his peril in such cases, and be subjected to the alternative of acquiescing in the interpretation adopted by his opponent, or putting to hazard his entire interest in the contract. The courts have never imposed terms so harsh, or burdens of such weight. It would amount to a virtual denial of the right to insist upon an honest, but erroneous, interpretation.' " 71 F.2d at 923 (quoting *Armstrong v. Ross*, 61 W. Va. 38, 55 S.E. 895 [1906]).

See also 9 Corbin, Contracts § 973 ("Where the two contracting parties differ as to the interpretation of the contract or as to its legal effects, an offer to perform in accordance with his own in-

terpretation made by one of the parties is not in itself an antici-
patory breach.").

In this case, there was not a clear repudiation of the contract or
a refusal to perform.

Plaintiffs also argue that Unison's threat to refuse to transfer the
shares was a breach of the covenant of good faith and fair dealing
which Kansas courts imply in every contract. See *Daniels v. Army
National Bank*, 249 Kan. 654, 658, 822 P.2d 39 (1991); *Bonanza,
Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). As pointed
out by Unison, plaintiffs did not claim breach of this duty before
the trial court. On appeal, a party cannot be permitted to change
its theory or present new issues which were not raised before the
trial court. *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 901,
522 P.2d 401 (1974).

### The "Poison Pill"

Plaintiffs' last argument regarding Count I is that Unison's adop-
tion of the Rights Plan was a breach of the Stockholders' Agree-
ment.

The Rights Plan adopted by Unison is what is often referred to
as a "poison pill." A poison pill can take many forms; always, its
purpose is to increase the time available for a board to react to a
bid for takeover and, often, to make a takeover costly or unap-
pealing by creating a negative which the acquirer must "swallow."
Now, 20 years after the pill was first proposed (then termed a
"warrant dividend plan"), the defensive strategy is widely accepted,
common in publicly traded companies, and viewed as an effective
- arguably the most effective - defensive mechanism available to
target corporations. See Lipton, *Pills, Polls, and Professors Redux*,
69 U. Chi. L. Rev. 1037, 1044 (2002); Bebchuk, Coates, & Sub-
ramanian, *The Powerful Antitakeover Force of Staggered Boards:
Theory, Evidence, and Policy*, 54 Stan. L. Rev. 887, 904-05 (2002).

The "Summary of Rights to Purchase Common Shares" issued
by Unison stated: "The purpose of the Rights Plan is to deter cer-
tain coercive takeover tactics and enable the Board of Directors to
represent effectively the interest of shareholders in the event of a
takeover attempt." Under the provisions of the Rights Plan, the

Board declared a divided of one common share for each outstanding share of Unison common stock. The rights were not exercisable or transferable and did not carry any voting or other stockholder rights until the "distribution date." A distribution date was defined to be 10 days after a person (including affiliates and associates) acquired, agreed to acquire, or commenced or announced a tender or exchange offer for common shares that would be sufficient in number to make the person owner of 20% or more of the then outstanding common shares. The rights granted by the plan included so-called "flip-over" and "flip-in" provisions which would allow the holder, under certain specified conditions, to buy an acquirer's stock and Unison's stock at a substantial discount (respectively, at a 50% discount and for $.001 per right per share of $1.00 par value). These rights would become exercisable in the event the "acquiring person" acquired, agreed to acquire, or commenced or announced a tender or exchange offer of more than 20% of the target's stock without the approval of the Unison board.

Plaintiffs do not challenge the general authority of the Unison board to adopt the Rights Plan under Kansas law. While that issue has never been decided by this court, most states have followed the lead of Delaware in recognizing such rights plans. See *Moran v. Household Intern., Inc.*, 500 A.2d 1346, 1353 (Del. Ch. 1985) (recognizing authority of directors to adopt rights plan; citing Del. Code Ann. tit. 8, § 157 for a corporation's power to issue rights to purchase shares and Del. Code Ann. tit. 8, § 141 for a board's authority to manage the corporation's business and affairs). Compare K.S.A. 17-6407 and 17-6301 with Del. Code Ann. tit. 8, §§ 157 and 141, respectively.

Plaintiffs do, however, assert that the Unison board, through the adoption of the Stockholders' Agreement, limited its authority to adopt this particular plan which had a triggering event of the acquisition or potential acquisition of 20% of the stock. Plaintiffs argue this was a unilateral alteration of the contract terms specified in the Stockholders' Agreement which defined "change of control" to be an acquisition of 35% or more of the outstanding shares by "any person or group of persons within the meaning of Section

3(a)(9) and Section 13(d)(3), as in effect of the date hereof, of the Securities Exchange Act of 1934, as amended . . . ."

The Stockholders' Agreement provided that it "shall not be amended, modified or supplemented in any manner whatsoever except as otherwise provided herein or in writing signed by each of the parties hereto."

We must consider this argument in light of the requirement that the Stockholders' Agreement be strictly construed. *Thompson*, 209 Kan. at 555. The Stockholders' Agreement did not prohibit the adoption of a rights plan. Nor did the Stockholders' Agreement restrict the power of the board of directors to issue dividends or additional common shares. See 11 Fletcher, Cyclopedia of the Law of Private Corporations § 5086 (2003). Thus, there was no restriction on the power of the board to do any of those things necessary to adopt or implement the Rights Plan. See *Account v. Hilton Hotels Corp.*, 780 A.2d 245 (Del. 2001) (board has power to unilaterally adopt rights plan; rights plan does not impermissibly restrict transfer of shares).

Furthermore, the Rights Plan did not alter the Stockholders' Agreement. The options to purchase granted by the Stockholders' Agreement were not altered. Nor was there a redefinition of the circumstances which triggered the rights granted by the Stockholders' Agreement.

Additionally, at the time of the execution of the Stockholders' Agreement, Kansas had in place the Control Share Acquisitions Act, K.S.A. 17-1286 *et seq.* (the Act). Under the Act, the acquiror of 20% or more of the outstanding shares of an "issuing public corporation" (K.S.A. 17-1289) cannot vote those shares unless a majority of disinterested stockholders grant the acquiror voting rights. (Although the record in this case does not clearly establish that Unison is an "issuing public corporation," Unison asserted the Act applied in Dolson's letter of February 2, 2000, and has continued to argue its applicability. Plaintiffs have not disputed this position. The Stockholders' Agreement provided that Kansas law governed interpretation.)

Although the Act is very different from the Rights Plan at issue, both use a lower threshold than does the Stockholders' Agreement. The purpose of the Act is similar to that of the Rights Plan:

"[T]he fundamental purpose behind the enactment of control share acquisition statutes is to impose significant delays, if not insurmountable barriers, on potential offerors. . . .  For practical purposes a suitor will be 'extremely reluctant to acquire stock above any of the [statutory] threshold' lest she become permanently disenfranchised and unable to vote her stock." Matheson & Olson, *Shareholder Rights and Legislative Wrongs: Toward Balanced Takeover Legislation,* 59 Geo. Wash. L. Rev. 1425, 1444 (1991) (quoting Andre, *A Preliminary Inquiring into the Utility of Vote Buying in the Market for Corporate Control,* 63 S. Cal. L. Rev. 533, 554 [1990]).

Although the Act does not directly impact the issue before us, it dispels the plaintiffs' argument that "but for" the Rights Plan their ability to sell up to 35% of Unison's stock was unfettered. Further, the Act illustrates that there can be different thresholds in various contexts for what constitutes "change of control" without there being an inconsistency or irreconcilable conflict.

Further, we note that, in general, the courts of other states, particularly Delaware, have recognized that a corporation can undertake corporate actions even if it has the result of mooting a shareholder's agreement unless the law, articles of incorporation, bylaws, or a contract specifically prohibit the corporate action. For example, in *Shields v. Shields,* 498 A.2d 161 (Del. Ch. 1985), minority shareholders alleged a merger had the effect of breaching the shareholder's agreement by removing from the stock restrictions the requirement that other shareholders be offered first refusal rights of the shares at book value. The merger was largely to avoid the effects of a prior shareholders' agreement. The Delaware court found the action appropriate if "the best interests of the shareholders as a whole would be served by [the] action . . . ." 498 A.2d at 170. Thus, the validity of the action "is to be tested by the provisions of the corporation law governing [the corporate action], and in appropriate cases by the fiduciary standards imposed upon directors and controlling shareholders, and not by the provisions of an agreement between shareholders of the corporation." 498 A.2d at 168.

In the past, we have found Delaware decisions regarding corporation law persuasive, noting that the Kansas "General Corporation Code has been patterned after, and at times contains identical provisions of, the Delaware general corporation law." *Achey*

*v. Linn County Bank*, 261 Kan. 669, 676, 931 P.2d 16 (1997). Similarly, in this case, we find persuasive the rationale of the Delaware Chancery Court in generally upholding the lawfulness of rights plans under a variety of attacks, including breach of stockholders' agreements.

In this case the Stockholders' Agreement was not directly amended by the Rights Plan. Nor was there an irreconcilable difference established by having two different thresholds which triggered distinct rights. Furthermore, the Rights Plan was not prohibited by the Stockholders' Agreement. Therefore, we find that the appropriate issue is whether there was a violation of fiduciary duty or other tortious action in adopting the Rights Plan.

Thus, we affirm the trial court's decision to grant defendants' motions for summary judgment for breach of contract (Count 1) and to deny the plaintiffs' motion for partial summary judgment.

*Issue 3: Are the Tort Claims Subsumed Within the Contract Claims?*

Before addressing the specifics of the defendants' arguments as to each tort count, we must address Unison's contention that because plaintiffs' tort claims (Counts II, III, and IV) are premised on the same conduct as their breach of contract claim (Count I) the tort claims are "subsumed" into the contract claim. In support, Unison cites *Ford Motor Cred. Co. v. Suburban Ford*, 237 Kan. 195, 699 P.2d 992 (1985).

In *Suburban Ford*, a secured party brought an action against a vehicle dealership pursuant to its financing agreement seeking an accounting for proceeds of vehicle sales and a deficiency judgment. The dealership and defendant guarantors counterclaimed on a number of tort theories alleging that the secured party's tortious acts caused the collapse of the dealership. In ruling that the trial court erred in allowing the jury to consider any of the tort-based claims, this court emphasized that all of the parties were in a contractual relationship and all of their difficulties arose directly from that contractual relationship. 237 Kan. at 203-05. The court quoted extensively from *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th

Cir. 1984), an opinion "pointing out the impropriety of confusing contract and tort law." 237 Kan. at 203.

Unison's reading of this case is more expansive than the facts and holdings of the case justify. See Rossi, *Lender Liability in Kansas: A Paradigm of Competing Tort and Contract Theories*, 29 Washburn L.J. 495, 518 (1990). The contract at issue in *Suburban Ford* contained language specifically negating the duty allegedly violated by defendants. The plaintiffs were pleading a tort to avoid certain consequences of the contract. Quoting *Isler*, 749 F.2d at 23, the court stated: " 'No reason appears to support such a radical shift from bargained-for duties and liabilities to the imposition of duties and liabilities that were expressly negated by the parties themselves when they decided to abandon their status as legal strangers and define their relationship by contract.' " 237 Kan. at 203.

Furthermore, Unison's argument is contrary to several opinions of this court. See, *e.g., Bittel v. Farm Credit Svcs. of Central Kansas, P.C.A.*, 265 Kan. 651, 962 P.2d 491 (1998); *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 757 P.2d 304 (1988); *V-W Enterprises, Inc. v. Federal Savings & Loan Ins. Corp.*, 234 Kan. 354, 673 P.2d 1112 (1983).

In *Bittel* this court explained "when conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies." 265 Kan. at 660.

The determination of what constitutes an independent tort is difficult to assess. Application of the test has lead to considerable criticism and commentary. See, *e.g.*, Linzer, *Uncontracts: Context, Contort and the Relational Approach*, 1988 Ann. Surv. Am. L. 139; Robinson, *Contorts for Busted Business Deals*, 72 J.K.B.A. 24 (March 2003); Dorff, *Attaching Tort Claims to Contract Actions: An Economic Analysis of Contort*, 28 Seton Hall L. Rev. 390 (1997); Rossi, 29 Washburn L.J. 495; Linzer, *Rough Justice: A Theory of Restitution and Reliance, Contracts and Torts*, 2001 Wis. L. Rev. 695.

However, in this case, as more fully discussed below, the duties and liabilities plaintiffs attempt to impose were not those bargained

for in the Stockholders' Agreement. Nor were duties, such as a fiduciary duty, negated by the contract. In fact, as we have noted, the plaintiffs' action in this case is more appropriately based upon an independent tort and as a matter of law is not based upon breach of a contract under the theory pled by the plaintiffs. In *Bittel*, we reversed the trial court's determination that a plaintiff may only pursue one remedy. 265 Kan. at 660. Thus, plaintiffs were not precluded from pleading both a breach of contract and independent torts even if based upon the same facts. If plaintiffs can satisfy the elements of an independent tort, the plaintiffs may pursue that remedy.

*Issue 4: Did the District Court Err in Granting Summary Judgment in Favor of Unison and Bunten on Count IV Alleging Breach of Fiduciary Duty?*

In granting defendants' motions for summary judgment on Counts II, III, and IV, the district court noted that all three claims were based upon an intentional tort. The court stated:

"A mere interference would not be sufficient for the plaintiff to recover, and in these cases I don't think there's any genuine factual dispute but what there was probably some interference going on here and the sale ended up not taking place. But the Court doesn't believe that the interference that took place was tortious interference nor did it rise to the level of a breach of fiduciary duty.

"The Court concludes from reading all of the papers that have been submitted to me that the actions of the Defendants Bunten and Unison Bancorp, Inc., all bore a relationship to a legitimate business purpose. The directors of Unison Bancorp and the corporation itself had a fiduciary duty, not just to the plaintiffs, but to all of its shareholders and Mr. Bunten, as the president of the corporation had the same obligation and duty. To say that the things that they did and the actions that they took were a tortious interference overstates the evidence in this case."

In Count IV, plaintiffs alleged that Unison and Bunten breached their fiduciary duty to plaintiffs. The district court found that the actions of Unison and Bunten were not tortious and did not constitute a breach of fiduciary duty.

Defendant Unison argues that it is only the board of directors of a corporation, and not the corporation itself, that owes a fidu-

ciary duty to the shareholders. Therefore, Unison owes no fiduciary duty to plaintiffs as a matter of law.

This position is consistent with this court's previous statements regarding corporate fiduciary duty: "Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders." *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 467, 790 P.2d 404 (1990). "Directors and officers are liable to the corporation and the stockholders for losses resulting from their malfeasance, misfeasance or their failure or neglect to discharge the duties imposed by their offices." *Sampson v. Hunt*, 233 Kan. 572, 584, 665 P.2d 743 (1983) (citing 19 Am. Jur. 2d, Corporations § 533).

The plaintiffs have not cited any Kansas case in which the court found that a corporation owes a fiduciary duty to its stockholders; rather, it is the corporate management that owes the duty to both the corporation and its stockholders. Nor have the plaintiffs cited any Kansas case holding that a corporation may be held vicariously liable for its directors' breach of fiduciary duty. As other courts have recognized:

"Directors, in the ordinary course of their service as directors, do not act as agents of the corporation, however. *See Restatement (Second) of Agency*, § 14C (1958) ('Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or its members.') An agent acts under the control of the principal. The board of directors of a corporation is charged with the ultimate responsibility to manage or direct the management of the business and affairs of the corporation. 8 *Del. C.* § 141(a). A board of directors, in fulfilling its fiduciary duty, controls the corporation, not vice versa.

"It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation. Holding the corporation vicariously liable for the directors' breach of a fiduciary duty 'would be flatly inconsistent with the rationale of vicarious liability since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach.' *Radol v. Thomas*, 6th Cir., 772 F.2d 244, 258-259 (1985)." *Arnold v. Society for Sav. Bancorp, Inc.*, 678 A.2d 533, 539-40 (Del. 1996).

Unison, as a corporation, acts only through the decisions of its board of directors. Although the trial court relied on a different

reason for its decision, summary judgment in favor of Unison on Count IV was appropriate.

On the other hand, Bunten as an officer and director owed a fiduciary duty to the corporation and its shareholders. Bunten agrees, but contends he was entitled to summary judgment on Count IV because the allegations contained in plaintiffs' petition either failed to state a claim or were not supported by any evidence. At least in part this argument is based upon application of the business judgment rule which the trial court concluded insulated Bunten from liability.

This court has previously defined the business judgment rule as follows:

> " 'The presumption that in making business decisions *not involving direct self-interest or self-dealing*, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. The rule shields directors and officers from liability for unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority.' Black's Law Dictionary 192 (7th ed. 1999)." (Emphasis added.) *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 759, 27 P.3d 1 (2001).

As emphasized, this rule applies in business decisions not involving direct self-interest. The Delaware Supreme Court has recognized that boards reacting to takeover issues are dealing with decisions which involve an inherent conflict where an issue of control of the corporation is at stake. "Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (1985). The concern applies to both inside and outside directors: "A takeover of [a] corporation may result in the loss of a job for an inside director, a director who is also employed as an officer of the corporation, while an outside director may be ousted from the board, losing the prestige and privileges attendant to that position." Palm & Kearney, *A Primer on the Basics of Directors' Duties in Delaware: The Rules of the Game (Part II)*, 42 Vill. L. Rev.

1043, 1049 (1997). Inherently there is concern about "loss of control and job security for target managers. . . ." Johnson & Siegel, *Corporate Mergers: Redefining the Role of Target Directors*, 136 U. Pa. L. Rev. 315, 318 (1987).

Largely because of such concerns, an enhanced standard of review has been applied by the Delaware Supreme Court in situations where the board adopts a poison pill. In *Moran v. Household Intern. Inc.*, 500 A.2d 1246, 1351-52 (Del. 1985), the Delaware Supreme Court recognized the authority for a board of directors to adopt a rights plan but stated that the directors' action would be required to withstand enhanced scrutiny:

> "The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.' [Citation omitted.] Notwithstanding, in *Unocal* [*v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)] we held that when the business judgment rule applies to adoption of a defensive mechanism, the initial burden will lie with the directors. The 'directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed. . . . [T]hey satisfy that burden "by showing good faith and reasonable investigation. . . .' " *Unocal*, 493 A.2d at 955 [citation omitted]. In addition, the directors must show that the defensive mechanism was 'reasonable in relation to the threat posed.' *Unocal*, 493 A.2d at 955." *Moran*, 500 A.2d at 1356.

Professor Gilson of Stanford Law School and Professor Kraakman of Harvard, in an article they co-authored, explained the rationale for requiring enhanced scrutiny:

> "The courts have long struggled with a standard for reviewing management's efforts to deter or defeat hostile takeovers. The usual standards of review in corporate law, the business judgment rule and the intrinsic fairness test, do not seem adequate when courts must evaluate defensive measures that implicate both management's business acumen and its loyalty to shareholder interests. Because evaluating a sale of the company is a complex business decision, management's response to a takeover bid resembles the normal business decisions that the business judgment rule largely insulates from judicial review. At the same time, however, a hostile takeover creates a potential conflict of interest, no matter what response it evokes from management. Target managers who approve an offer may be improperly influenced by post-transaction benefits; target managers who reject an offer may act largely to secure their own positions. From this perspective, responding to a hostile takeover is an interested transaction that calls for judicial

review under the intrinsic fairness test. Yet, invoking this rigorous standard would simply condemn most defensive tactics without any justification beyond the standard itself." Gilson & Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?*, 44 Bus. Law. 247 (1989).

There has been much debate about the appropriateness of this test. Compare Gilson, *Unocal Fifteen Years Later (and What We Can Do About It)*, 26 Del. J. Corp. L. 491 (2001), with Lipton & Rowe, *Pills, Polls and Professors: A Reply to Professor Gilson*, 27 Del. J. Corp. L. 1 (2002), and Lipton, *Pills, Polls, and Professors Redux*, 69 U. Chi. L. Rev. 1037 (2002). After review of the various arguments by academicians and practitioners, we agree with the conclusions of one commentator:

"[A]n underlying coherent theory explains the Delaware Supreme Court's takeover jurisprudence. This theory is based on two fundamental precepts: that the directors, and not courts, should make business decisions; and that shareholders, and not courts, should voice their disagreement with the substantive decisions by electing different directors.

"Given the importance of hostile tender offers, and the potential for conflicts of interests when target boards decide to reject such offers, the court has adopted a two-track approach. First, the court has tried to enhance the process of the target board's decision-making to reduce the potential of such conflicts of interest. This is manifested in the inducements provided by *Unocal* to give the ultimate decision-making power to the independent directors and to have these directors go through an enhanced process of information-gathering.

"Second, the court has tried to preserve shareholders' ultimate power to effectively override the decision of a target board to reject a tender offer. This is manifested by the strict review under *Revlon* [*Inc., v. MacAndrews and Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)] of board actions that clearly deprive shareholders of such power. It is also demonstrated by the substantive proportionality review under *Unocal* of lesser board actions, undertaken in response to a hostile offer, that may substantially interfere with that power. By contrast, if the target board merely preserves the status quo or continues to pursue a pre-existing business plan, board actions are only subject to process review under *Unocal*.

"This approach differs from the one advocated by commentators on both sides of the spectrum. Many feel that it gives too much power to management or that it encroaches too much on managerial prerogatives. But, contrary to many claims, this approach is plausible and intelligible. Criticism of the takeover jurisprudence of the Delaware Supreme Court for lack of doctrinal consistency or policy foundation are unwarranted." Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J. Corp. L. 583, 606 (1994).

In addition, we note that despite criticism from outside sources, the Delaware courts, and with rare exceptions other jurisdictions, have continued to apply the *Unocal* test for over 20 years in a variety of fact patterns. A significant body of case law has developed. As our Court of Appeals has noted, "Kansas follows Delaware's basic principles regarding application of the business judgment rule to insulate board decisions from attack." *Gray v. Manhattan Medical Center, Inc.,* 28 Kan. App. 2d 572, 577, 18 P.3d 291 (2001). Consequently, we adopt the *Unocal* test as refined by its progeny.

As explained by the Delaware Supreme in *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361 (Del. 1995), *"Unocal's* standard of enhanced judicial scrutiny is proper whenever the record reflects that a board of directors took defensive measures in response to a 'perceived "threat to corporate policy and effectiveness which touches upon issues of control." ' [Citation omitted.]" 651 A.2d at 1372. If the action was defensive, the directors, in this case Bunten, have the burden of coming forward to meet the two-prong *Unocal* test.

The court in *Unitrin* explained that the first prong, the reasonableness test, requires directors of a corporation to "demonstrate that, after a reasonable investigation, it determined in good faith, that . . . [the offer] presented a threat . . . that warranted a defensive response." 651 A.2d at 1375. In that regard the court noted: "[T]he presence of a majority of outside independent directors will materially enhance such evidence." 651 A.2d at 1375 (citing *Unocal,* 493 A.2d at 955). However, the outside directors, defined as nonemployee and nonmanagerial directors, will not be seen as independent if the decision-making process is dominated by inside directors or officers. "Independence 'means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.' *Aronson v. Lewis,* Del. Supr., 473 A.2d 805, 816 (1984)." 651 A.2d at 1375. The court also noted that "final determinations regarding domination are usually made after a full trial." 651 A.2d at 1375 n.15.

The second prong, the proportionality test, requires only that a court examine whether the defensive measure was "draconian, by being either preclusive or coercive" and if it was not draconian, whether it was "within a range of reasonable responses to the threat" posed. 651 A.2d at 1367.

"If the directors' actions withstand *Unocal's* reasonableness and proportionality review, the traditional business judgment rule is applied to shield the directors' defensive decision rather than the directors themselves." 651 A.2d at 1374.

On the other hand, the "directors' failure to carry their initial burden under *Unocal* does not, *ipso facto*, invalidate the board's actions. Instead, once the Court of Chancery finds the business judgment rule does not apply, the burden remains on the directors to prove 'entire fairness.'" 651 A.2d at 1377 n.18. "The entire fairness standard is exacting and requires judicial scrutiny regarding both 'fair dealing' and 'fair price.'" 651 A.2d at 1371 n.7.

In applying the test as articulated by Delaware, the first issue is whether the various actions of the Unison board were defensive. As previously stated, Delaware applies the *Unocal* test when the board adopts a poison pill in response to a perceived takeover bid. *Moran*, 500 A.2d at 1351-52. See *In re Unitrin, Inc. Shareholders Litigation*, 1994 WL 698483 (Del. Ch. 1994), *reversed on other grounds* 651 A.2d 1361 (Del. 1995) (applying *Unocal* in context of a "creeping takeover"). Although other actions by the board, in isolation, might not be seen as subject to the *Unocal* test, the Delaware Supreme Court has held that its courts "should evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby. Where all of the target board's defensive actions are inextricably related, the principles of *Unocal* require that such actions be scrutinized collectively as a unitary response to the perceived threat." *Unitrin*, 651 A.2d at 1386-87.

The parties disagree as to whether the actions were defensive and, thus, raise an issue of fact. If it is determined that the Board acted in defense to a perceived takeover, Bunten has the burden of coming forward and meeting the two-prong test. Issues of fact exist as to both prongs.

Plaintiffs focus their argument on whether Bunten had self-interested motives in obstructing their agreements with Gold. As evidence of Bunten's misconduct and self-dealing, plaintiffs point to the testimony of Burcham and Aslin who stated that Bunten requested compensation assurances from them in exchange for favorable consideration of their offers to purchase Unison. Bunten denied having discussed personal compensation with either Burcham or Aslin. However, for purposes of summary judgment we must view the evidence in the light most favorable to the party opposing the motion, the plaintiffs.

Furthermore, plaintiffs contend that Bunten "orchestrated and directed" the board's actions. Again, viewing the evidence in the light most favorable to the plaintiffs the evidence is that, before the board met or took any action, Bunten contacted Dolson and began legal work on developing a mechanism for dealing with a perceived takeover attempt.

As to the proportionality test, an issue of fact exists as to whether the actions were proportionate to the threat.

Thus, under the new test we adopt today, summary judgment could not be granted because there are issues of fact which must be resolved before determination of whether the business judgment rule should be applied to the various actions taken by Bunten in response to the proposed purchase of shares and perceived takeover attempt of Unison. Therefore, we reverse the trial court's decision to grant summary judgment to Bunten on the claim of breach of fiduciary duty.

However, we do note that two of the plaintiffs' allegations do not fall within this analysis. First, there is an allegation that there was a breach of fiduciary duty resulting from the breach of the Stockholders' Agreement. Since we determined there was no breach of the agreement, summary judgment was appropriate as to this allegation. Second, plaintiffs alleged Bunten breached a fiduciary duty by "misrepresenting the terms and requirements of the Stockholders' Agreement relative to plaintiffs' contracts." There was no evidence presented of a misrepresentation made by Bunten. Again, as to this allegation summary judgment was appropriate.

The other allegations, however, require application of *Unocal* and its progeny.

*Issue 5: Did the District Court Err in Granting Summary Judgment in Favor of Unison and Bunten on Count II Alleging Tortious Interference with Plaintiffs' Contract to Sell Their Unison Shares to Gold?*

In Kansas, a person who, without justification, induces or causes a breach of contract will be answerable for any damages caused thereby. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). " 'The elements essential to recovery for tortious interference with a contract are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom.' " *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 168-69, 872 P.2d 252 (1994) (quoting 45 Am. Jur. 2d, Interference § 39, p. 314).

Both defendants argue that the district court's order granting summary judgment on Count II may be upheld on the basis that plaintiffs did not have an enforceable contract with Gold nor did Gold breach that contract.

Defendants claim that plaintiffs' letter agreements with Gold are similar to the documents at issue in *Noller v. General Motors Corp.*, 13 Kan. App. 2d 13, 760 P.2d 688 (1988), *rev'd in part on other grounds* 244 Kan. 612, 772 P.2d 271 (1989). In that case, plaintiff Noller entered into an agreement to purchase Beard's GMC dealership, with the condition precedent that GMC approve Noller's purchase of the franchise. When GMC refused such approval, Noller justifiably abandoned the agreement with Beard and it was never performed. Noller then sued GMC for tortious interference with his contract with Beard. The Court of Appeals ruled that there was no existing, enforceable contract between Noller and Beard; therefore, Noller could not claim tortious interference with a contract. 13 Kan. App. 2d at 27.

This case is analogous to *Noller*. When Gold withdrew its offer or refused to perform under the agreement, it specifically mentioned two conditions to closing: "(1) the absence of any material

adverse change in Unison and (2) the accuracy of all your representations and warranties as of the closing date." Aslin's letter stated that Unison's adoption of the Rights Plan constituted a material adverse change in Unison and contradicted plaintiffs' representation that there were no contracts or agreements relating to the sale of their shares. Aslin also stated that the actions threatened in the Dolson letter contradicted plaintiffs' representation that there was no action threatened which might delay consummation of the sale. Aslin stated that, because of Unison's actions, the conditions to closing could not be met.

As in *Noller*, plaintiffs in this case cannot maintain an action for tortious interference with a contract because there was no existing, enforceable contract. Summary judgment is appropriate on Count II for this reason, although it is a different reason than the one relied upon by the trial court. See *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 118, 936 P.2d 714 (1997) (district court's reason for decision is immaterial if ruling is correct for any reason).

*Issue 6: Did the District Court Err in Granting Summary Judgment in Favor of Unison and Bunten on Count III Alleging Tortious Interference with Plaintiffs' Business Expectancy in the Sale of Their Shares to Gold?*

Plaintiffs argue that the district court erred in granting summary judgment in favor of Unison and Bunten on Count III. In Count III, plaintiffs alleged that Unison and Bunten tortiously interfered with plaintiffs' business expectancy based upon the same conduct as alleged in Count II.

Kansas recognizes a cause of action for tortious interference with a prospective business advantage or relationship. The requirements for this tort are:

"(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

"Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on ma-

licious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations." *Turner*, 240 Kan. at 12.

## Malice and Justification

The trial court's ruling was based upon a finding that defendants' interference was not tortious and that defendants' actions had a legitimate business purpose. Not all interference with contractual relationships is tortious. A claim of tortious interference with a contract is predicated upon malicious conduct by the defendant. *Turner*, 240 Kan. at 12. On the other hand, "[a] person may be privileged or justified to interfere with contractual relations in certain situations." *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 211, 25 P.3d 871 (2001) (citing *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 424-25, 370 P.2d 390 [1962]). " 'The term "justification" has been said not to be susceptible of any precise definition. It is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal malice.' " *Turner*, 240 Kan. at 12-13 (quoting 45 Am. Jur. 2d, Interference § 27).

In determining whether a defendant's conduct is improper, the following factors should be considered:

"(1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties." *Reebles*, 29 Kan. App. 2d at 212 (citing *Turner*, 240 Kan. at 14).

The issues of defendants' motive and the presence or absence of malice are typically questions for the jury. See generally *Burrowwood Associates, Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, 400-01, 853 P.2d 1175 (1993). Despite this rule, the trial court, in essence, determined that there was justification because the conduct satisfied the business judgment rule. However, as we have discussed, as that rule is to be applied in this case there are

issues of fact which remain as to defendants' motives and, contrary to defendants' arguments, as to whether defendants' actions caused the harm to plaintiffs.

We, therefore, reverse the trial court's granting of defendant Unison's and defendant Bunten's motions for summary judgment on the count of tortious interference with plaintiffs' business expectancy.

Affirmed in part, reversed in part, and remanded for further proceedings.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned▊