NOT DESIGNATED FOR PUBLICATION

No. 126,817

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.W., a Minor Child.

MEMORANDUM OPINION

Appeal from Harvey District Court; JASON R. LANE, judge. Submitted without oral argument. Opinion filed November 27, 2024. Affirmed.

*Ben Baumgartner*, of Baumgartner Law Office, of Newton, for appellant natural father.

*Laura E. Poschen*, special prosecutor for the State of Kansas, and *Sandra L. Lessor*, deputy county attorney, for appellee.

Before ATCHESON, P.J., HURST and PICKERING, JJ.

HURST, J.:  Father appeals the termination of his parental rights, arguing the district court erred in finding him unfit to adequately care for L.W. and that his unfitness was unlikely to change in the foreseeable future. Unlike many tragic cases before this court, Father is not accused of abusing or neglecting L.W. and has taken many steps toward reintegration. While parenting perfection is not required, in almost two years, Father failed to perform or complete several case plan tasks essential to providing L.W. with adequate care—particularly given L.W.'s serious medical and behavioral needs. Therefore, the district court's findings that Father is unfit to adequately care for L.W. and such unfitness is unlikely to change in the foreseeable future are supported by clear and convincing evidence. The district court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 19, 2021, the Kansas Department for Children and Families (DCF) assessed the home of Father, Mother, and the newborn L.W. after receiving a report that the home had several broken windows causing it to be extremely cold. DCF was also notified that Mother had a previous child removed due to malnourishment, diaper rash, and constipation. When DCF inspected the home, they found it cluttered and smelling heavily of cigarette smoke, but many of the broken windows were covered with plywood or plastic so that it was sufficiently warm. At that time the family was participating in multiple community support programs.

A few months later, DCF received a second report of concerns for L.W.'s physical well-being after she had been admitted to the hospital twice with concerns about inadequate weight gain. DCF held a Team Decision Making (TDM) meeting with L.W.'s family and their support systems including a pediatrician who had been working with the family. The pediatrician determined that the family struggled to maintain a regular feeding schedule and L.W. was spitting up her formula. The family changed L.W.'s formula, started a medication to help with indigestion, and a nurse planned to visit the home after discharge. L.W. was also referred to other specialists.

In her affidavit, the DCF child protection specialist stated that Mother was arrested for domestic battery of Father on May 29, 2021, after pushing Father while he held L.W. in a carrier. After a TDM meeting in June 2021, the DCF worker stated that concerns with the home had increased:  Father lacked patience with Mother and L.W.; roommates had moved into the home; and then Father brought L.W. to live with him and his ex-wife, which created concerns about childcare while Father worked.

On June 4, 2021, the State sought a temporary protective order seeking to have L.W. removed from the home pending a determination that she was a child in need of care (CINC). The State alleged that L.W. was without adequate parental care, control, or subsistence not due solely to a lack of financial means and that she was without the care or control necessary for her physical, mental, or emotional health. The State included the DCF worker's affidavit describing the events leading to the request, and the district court ultimately granted a temporary order of protective custody removing L.W. from her home with Father and Mother the same day.

On June 22, 2021, Saint Francis Ministries (SFM) documented the apparent first case planning conference which stated that L.W. could not return home because "[t]he home conditions, domestic violence within the home; questionable parenting skills to handle [L.W.]'s medical needs for her age, and mental health of mother." Mother and Father were given one hour of supervised visits with L.W. per week, the parents were given case plan tasks to complete, and SFM planned to meet with the parents monthly. On July 25, 2021, L.W. was placed in a foster home where she remained through the termination hearing. SFM also noted that since being placed with a foster home, L.W. had been on a routine feeding schedule and was eating better.

*CINC Determination (September 28, 2021)*

On September 28, 2021, the district court held a hearing to determine whether L.W. was a child in need of care. L.W. was having regular physician appointments at that time which Mother attended, and SFM reported a desire for Father to also attend. L.W. was having weakness on one side and began weekly physical therapy on September 9, 2021. SFM reported that Father and Mother had weekly three-hour visits with L.W. where Mother primarily cared for L.W. and Father would frequently step out to smoke and was often on his phone. The court found L.W. to be a CINC.

*Termination Hearing (March 29, 2023, and May 12, 2023)*

On December 12, 2022—about a year and a half since L.W. had been removed from the home—the State moved to terminate Father's parental rights. Mother had voluntarily relinquished her rights, so the hearing proceeded only as to Father's parental rights on March 29, 2023. Several witnesses testified including Father, a court appointed special advocate (CASA), the foster parent, and the SFM permanency specialist. The district court terminated Father's parental rights on May 12, 2023.

Father needed to complete the following case plan tasks:

- Obtain and maintain employment and provide proof of employment to SFM;
- Update SFM with any change in status (address, phone number, etc.);
- Obtain and maintain appropriate housing that has adequate space for L.W.;
- Allow SFM to complete a walkthrough of his home and follow recommendations;
- Complete background checks for Father and anyone living in the reintegrative home;
- Complete an age-appropriate parenting class and provide SFM with documentation of completion;
- Submit to random drug testing;
- Complete a psychological evaluation and IQ evaluation and follow all recommendations. After completing this task, the recommendations were for individual therapy, grief support group, substance use assessment, vocation rehabilitation, couples therapy if in a relationship, anger management, demonstrate parenting skills, and participate in L.W.'s services to gain knowledge of her needs;
- Complete a mental health evaluation and follow the recommendations;
- Sign releases of information for SFM and DCF;
- Enroll in and complete anger management classes; and

4

- Demonstrate the ability to attend, listen, and retain information provided by or about L.W.'s medical providers, demonstrate the ability to practice needed exercises with L.W., and communicate her needs to others.

*Father's Compliance with the Case Plan Requirements*

According to the SFM permanency specialist, Father failed to complete several of these tasks. Father testified that he completed all the required tasks except passing the home walkthrough and completing individual therapy. While Father claimed he attended all the case plan review meetings—which were intended to review the parents' progress toward case plan tasks and discuss resources—the SFM permanency specialist testified that Father had only attended the first two of the five meetings.

According to the SFM permanency specialist, Father failed to regularly provide paycheck stubs, allow a home walkthrough until partway through the termination hearing, submit to a final drug test, attend individual therapy, demonstrate parenting skills, complete anger management class, and attend the vast majority of L.W.'s appointments. The SFM report documented that Father provided a few paystubs, updated his information with SFM, had a home, completed one parenting class and provided a copy of his certificate, attended anger management classes, and signed releases of information. Father completed two or three drug tests during this case that were negative for illegal substances, though but he did not appear for a drug test scheduled for shortly before the termination hearing on April 28, 2023. Father also completed an achievement plan to help him prioritize case plan tasks for completion, but he did not provide verification of completing identified tasks.

5

*The Case Plan Requirement to Maintain Contact with SFM and CASA*

Father completed regular meetings with workers from SFM and CASA. The SFM permanency specialist testified that she met with Father for worker/parent meetings in August 2022, September 2022, October 2022, December 2022, and January 2023. She confirmed that these worker/parent meetings are opportunities for Father to ask questions, discuss resources, complete court orders, and discuss visitation. One of the CASA advocates on the case testified that since being involved in the case in August 2021, he had meet with Father once a month. The CASA advocate testified that he communicated with Father by text and call, and the meetings were to see how Father was keeping up with the case plan, check on his employment situation, and see his home. The CASA advocate's two most recent reports were admitted into evidence.

*The Case Plan Requirement to Maintain and Provide Proof of Employment*

Father confirmed that he had been employed consistently throughout this case. However, the SFM permanency specialist testified that although Father reported he was employed, she had only received two pay stubs for verification despite regularly asking him to submit them.

*The Case Plan Requirement to Maintain Appropriate Housing*

Father testified that he had been living in the same four-bedroom home for about a year and a half. According to Father, the home had central air and heat and did not have any broken windows or dangerous conditions. The CASA advocate expressed concerns with the home's condition but had only been inside once in November 2021, which was before some renovations. Father confirmed that the SFM permanency specialist had

requested to visit, but the home was under construction. Father stated that once the home was ready, the worker told Father not to worry about the home visit. Father provided inconsistent testimony regarding his plans to sell the home and move but stated that he had childproofed the residence.

The SFM permanency specialist testified that she met Father at his home on April 17, 2023, between the first and second days of the termination hearing. She stated that Father was smoking in the home, there was a board missing from the front porch, and there were things on the coffee table which gave her concerns. However, on cross-examination the SFM permanency specialist confirmed Father had heating and cooling and running water, and that she did not see any broken windows or doors.

*The Case Plan Requirements to Obtain a Mental Health Assessment and Attend Individual Therapy*

Father completed the mental health assessment and was supposed to comply with its recommendation for individual therapy—which he had not yet completed at the time of the termination hearing. Father explained that he was prepared to attend individual therapy, but the facility kept postponing or not allowing him to schedule appointments; and then the one time he was supposed to meet with someone, he got COVID. He stated that between April and November of 2022, he called the facility about 15 times to set up an appointment but was only able to leave a voicemail and did not receive a return call. Father confirmed that he got an appointment scheduled in December 2022 but that Prairie View emailed him canceling it.

The SFM permanency specialist testified that Father had not completed individual therapy for the year and a half that it had been a required case plan task. She offered to help Father reduce the therapy cost, but he never provided paystubs required for the

7

sliding fee application. She also testified that the therapy facility told her that Father had not contacted them since December 2022.

*The Case Plan Requirement to Attend Anger Management Class*

Father testified that he attended 12 to 16 anger management classes and turned in his completed workbook to get the certificate about a week or two before the hearing, but he had not yet received the proof of completion. The SFM permanency specialist testified that although Father finished his anger management classes in December 2021, he had yet to complete and turn in his workbook to get the certificate. Further, when Father lost his workbook, she offered to help him get a new one, and, due to Father's difficulty reading, she offered to help him complete the workbook. Father did not accept her assistance.

*The Case Plan Requirement to Attend Regular Visitation with L.W.*

According to the SFM reports, Father and Mother initially had joint, supervised visits for an hour-and-a-half during which L.W. would cry and her parents had little insight into how to calm her. In August 2021, the visits were extended to six-hour monitored visits per week, during which L.W. would cry and refuse to eat or drink her bottles, and her parents still struggled with parenting skills. In a December 2021 visit, it was disclosed partway through that Father had been exposed to COVID but still attended the visit. In January 2022, visits were reduced to three hours per week and then one hour per parent on different days due to L.W.'s escalating behaviors, domestic violence incidents between Father and Mother, and the pediatrician's concerns about L.W.'s response to the parent visits.

In March 2022, visitation was decreased yet again to 30 minutes per parent, separate, with the foster parent in the room. It was documented that Father would interact

with L.W. during half the visit—including sitting on the floor and playing—but then would give L.W. his phone to entertain her for the rest of the visit. The SFM report documented that Father had a visit in July 2022 and engaged with L.W., but in August 2022 Father notified SFM that he could not attend because he was ill; although he was seen outside the building talking to Mother.

The SFM permanency specialist testified that Father's attendance at visits began to decline in October 2022 and that by the time of the second termination hearing date in May 2023 he had missed 17 of the 22 offered visits. She stated that these visits were on Mondays at 9 a.m. and Father was supposed to text or call by 5 p.m. the day before a visit to confirm he would attend. After he did not appear for a confirmed visit in the time between the two termination hearing dates, Father had to sign a form stating that he would not only call to confirm a visit the day before but would also arrive at the office early. The SFM permanency specialist testified that Father did not request any change to the visitation schedule to accommodate his work schedule and had never progressed to unsupervised visits. Father testified that he only missed two visits because he was sick, was late to one because he got called to work, and had some visits canceled by SFM.

*The Case Plan Requirement to Attend Medical Visits*

L.W.'s foster parent testified that based on the medical records L.W. had several medical diagnoses that included:

- a speech and language development disorder;
- slow transit constipation with reduced motility of the large intestine;
- lack of expected physiological development in childhood;
- stereotyped movement disorders of repetitive, rhythmic, purposeless movements;
- a motor function development disorder;

9

- a chromosomal abnormality;
- acute serious otitis media, recurrent in the right ear;
- Autistic disorder;
- Coffin-Siris Syndrome Type 12;
- Chronic pediatric feeding disorder; and
- Microencephaly.

The foster parent testified that the Microencephaly was observed when L.W. was an infant; the developmental delays were identified in December 2021; Coffin-Siris Syndrome Type 12 and chromosomal abnormality were identified in July 2022; and the autism and otitis media were identified in October 2022. She also stated that from September 2021 to July 2022, L.W.'s appointments were steady, but they increased in July 2022 after additional diagnoses. The foster parent confirmed that she will need continual training on how to care for L.W. as she goes through different life stages.

When asked to describe L.W.'s special needs, Father testified that she has a few, including inability to swallow food properly, physical therapy, speech therapy, and that there was one more he could not remember. Father testified that he believed L.W. had been diagnosed with PTSD, she was "slow," and she had weak muscles necessitating physical therapy. He denied knowing that L.W. had recently been diagnosed with autism. Father denied doing much independent study regarding L.W.'s diagnoses or taking any training or education classes to understand L.W.'s treatment. He stated that he believed L.W. was "doing better" but did not know who L.W.'s therapists were and did not recall ever being given that information. Father did not know L.W.'s daily medications or whether she had any allergies.

Father denied that anyone had explained all L.W.'s conditions, treatments, and needs but said he could learn and help L.W. if given the information. Father denied

10

asking the SFM employees for this information in their monthly meetings but later said his inquiries were ignored. Father also blamed his former attorney for not notifying the court that Father was not receiving requested information. Father also confirmed that he had not attended L.W.'s medical appointments but explained that he did not believe his attendance was required under the case plan goals and that he would have attended if it had been required.

The CASA advocate denied that Father ever asked him about L.W.'s medical care, medications, therapies, surgeries, or the need for special education and confirmed he was concerned that Father may not understand L.W.'s special needs. The SFM permanency specialist testified that attendance at L.W.'s medical appointments became a required case plan task on May 27, 2022. She also testified that she gave Father a list of L.W.'s appointments and providers in September 2022 and again on April 27, 2023 (partway through the termination hearing). The September 2022 notification included appointment dates from September 11 through October 27, 2022, and the April 2023 information had appointments for the following two months. L.W.'s appointments were on the same days each week, and Father never told SFM that the appointments were at times he could not attend. Additionally, the SFM permanency specialist testified that she met with Father six times since making attendance at medical appointments a case plan task and that she spoke to him during these meetings about attending L.W.'s appointments.

The foster parent testified that she made a document listing L.W.'s pediatric appointments, therapies, neurology appointments, and other appointments that consisted of about four pages and identified about 200 appointments since July 2021. At the time of the termination hearing, the foster parent testified that L.W. had physical therapy once per week, occupational and eating therapy once per week, speech therapy once per week, and various other appointments. The foster parent confirmed she is in close contact with L.W.'s doctors and that she kept SFM updated on L.W.'s appointments. She also testified

11

that she works about 20 hours per week and confirmed she can adequately care for L.W. given her schedule.

Father said that he anticipated dedicating three hours each day to L.W.'s appointments and could accommodate the appointments because he makes his own work schedule. Father also testified that if L.W. came to live with him, Father's mother would move in to help. He also stated that his sister would help him. When asked why his mother or sister did not help him attend L.W.'s appointments previously, Father explained that they both live in Horton and his sister had to go to work and his mother had doctor's appointments on the dates he needed assistance. He added that his mother had recently taken care of a toddler for his sister and confirmed she does so on a regular basis. Father stated that he only found out about this termination hearing date the day before; otherwise his sister and mother would have come to the termination hearing.

Father confirmed he was the primary caretaker for his older child from the age of six and that the child was 26 years old at the time of the termination hearing. Father confirmed this older child had special needs when he was born, including a hard time swallowing, a muscle disease that meant he could not walk very well, and had to go to physical therapy. Father stated that he took this older child to all his appointments, confirmed he was actively involved in his therapies, and confirmed the older child was doing much better. Father stated that L.W.'s conditions were "identical" to his older child's. He also confirmed that he believed L.W. would need ongoing special care during her life, including a need for speech therapy, and that she will probably need assistance in school.

*The Case Plan Requirement to Attend Parenting Class*

The SFM permanency specialist testified that Father had taken a parenting class, but that it did not address L.W.'s specific needs. As a result, she referred Father to a

12

parenting class through St. Francis and sent them information to contact Father in January 2023—shortly before the start of the termination hearing. There was no indication that Father attended this class.

*Recommendations from SFM and CASA*

The CASA advocate stated that he believed L.W.'s interests would best be served staying with her foster family. The advocate believed Father lacked initiative to complete the case management goals and cited Father's refusal to complete and turn in the anger management workbook as an example for why he believed Father did not possess the ability to care for L.W.

The SFM permanency specialist also recommended that the court terminate Father's parental rights and believed that adoption by the foster parent was in L.W.'s best interests. She explained that Father had not participated in L.W.'s life for the previous six to seven months well enough to know her needs and how to care for her. She further testified that she believed it would take a year to reintegrate Father and L.W. if Father immediately began attending L.W.'s appointments and building a relationship with L.W.

*The Trial Court's Findings*

The district court found Father lacked consistency with visiting L.W. The court explained that Father had been offered regular visits during this case, but he attended less than half of the 22 recent visits and had attended none of the 6 visits offered from March to May 2023. During visits, the court found that Father's interaction with L.W. was minimal and he struggled to bond with her.

The court explained that although Father completed some of his case plan tasks, there were still tasks that had not been completed at the very late stages of this case. The

13

court found Father had failed to allow a walkthrough of his home until less than a month before the end of the termination hearing and it was clear that smoking was still occurring in the house. The court found Father's failure to set up individual therapy sessions demonstrated a lack of effort in "that he did not make sufficient attempts to set this up, and that even when offered help he denied the help and refused to accept it." The court noted there was "some evidence that he attended all the [anger management] classes" but had not completed and turned in his workbook, which is an essential piece of the program, even after being offered assistance.

Additionally, the court noted that L.W. had several medical diagnoses and faced lifelong medical needs and that Father had failed to show any effort to learn about or understand her conditions as required by the case plan. It found that from the inception of this case, L.W.'s medical needs were obvious—even though she did not yet have a diagnosis—and that SFM and others had provided him sufficient information, resources, and assistance to complete the case plan tasks requiring him to learn and understand L.W.'s needs. Even so, Father failed to show effort to learn or understand L.W.'s conditions.

The court stated that Father's actions showed no indication that he will come to understand L.W.'s needs or would prove to be a reintegrative resource in the near future. The court found by clear and convincing evidence that Father was unfit by reason of conduct or condition which rendered him unable to care properly for L.W. and that conduct or condition was unlikely to change in the foreseeable future. The court based its decision on the failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; a lack of effort by Father to adjust his circumstances, conduct, or conditions to meet L.W.'s needs; Father's failure to carry out a reasonable court-approved plan directed towards reintegration; and Father's failure to ensure L.W.'s care when able to do so. See K.S.A. 38-2269(b)(7)-(8), (c)(1), (c)(3). Additionally, the

14

district court concluded that it was in the best interests of L.W.'s mental, physical, and emotional well-being to terminate Father's parental rights.

## DISCUSSION

Father appeals the district court's termination of his parental rights arguing only that the court erred in finding he is currently unfit to properly care for L.W., and that this unfitness is likely to continue for the foreseeable future. Father argues that he substantially complied with the reintegration case plan and the district court's reasons for finding him currently unfit are insufficient. He also claims that the district court failed to consider factors weighing in his favor. Although the district court also found that termination of Father's parental rights was in L.W.'s best interests under K.S.A. 38-2269(g)(1), Father decided not to challenge that finding on appeal and rests his argument in a challenge to the finding of unfitness, stating in his brief that:

> "E.W. also strongly maintains it is in L.W.'s best interest for reintegration to occur. E.W. has raised a child before to successful adulthood, and a parent-child relationship is one that should not be severed unless it is of the utmost need. However, the legal argument for the first two overarching factors is likely more straightforward, and E.W. rests his argument on these points. Indeed, if even one of the two main points is overturned, the case as a whole must be remanded."

After a court adjudicates a child as being in need of care—meaning that a child meets at least one of the statutory definitions of a child in need of care—the court then orders a plan for how the child's needs should be addressed. These orders often involve a reintegration plan with one or more of the child's parents, which is what was done here. If the parent is unable to successfully complete the reintegration plan, the court may determine that the permanency plan should be changed to an adoption plan which often involves the court being asked to terminate the parent's rights. See *In re N.E.*, 316 Kan. 391, 393, 516 P.3d 586 (2022). That is what occurred here and what Father appeals.

15

The termination of parental rights is a rare measure taken to address the child's current and future needs. However, parents have a constitutionally protected right to a continuing relationship with their child that must also be addressed before terminating a parent's rights. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Parents have substantive liberty interests through the Fourteenth Amendment Due Process Clause which requires the court to find "by clear and convincing evidence that the parent is unfit" before terminating a parent's rights to their child. See K.S.A. 38-2269(a); *Santosky*, 455 U.S. at 753, 769-70. Specifically, the court must find that "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). If the court makes that finding, it must then determine whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(g)(1).

The district court considers, among other things, a statutory list of nonexclusive factors to determine whether the parent is unfit. See K.S.A. 38-2269(b), (c). Any one of these factors may present sufficient grounds upon which the district court could rely to terminate the parental rights. K.S.A. 38-2269(f). On appeal, this court reviews the district court's decision looking at the evidence in the most favorable light to the prevailing party to determine whether the district court's finding of unfitness is supported by clear and convincing evidence. In conducting that review, this court does not reweigh the district court's credibility determinations. See *In re B.D.-Y.*, 286 Kan. at 705.

The district court's journal entry contains the factors it relied on in making its finding of unfitness—which are consistent with its oral pronouncements—and will be considered in this court's review. See *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 402, 77 P.3d 130 (2003) (considering the court's oral pronouncement and journal entry to determine its reasoning).

16

*The District Court's Finding that Father is Presently Unfit is Supported by Clear and Convincing Evidence*

The district court found Father presently unable to properly care for L.W., rendering him unfit at the time and for the foreseeable future because:

- Appropriate public agencies were unable—despite reasonable efforts—to rehabilitate the family as set forth in K.S.A. 38-2269(b)(7);
- Father lacked effort to adjust his circumstances, conduct, or conditions to meet L.W.'s needs as set forth in K.S.A. 38-2269(b)(8);
- As a result of Father's action or inaction and one or more of the factors listed in K.S.A. 38-2269(c), L.W. had been in custody for 15 of the most recent 22 months beginning 60 days after the date L.W. was removed from the parental home.

Father argues that several of the statutory factors supporting termination of parental rights do not apply to him—which should weigh in his favor or somehow undercut the court's decision to terminate his parental rights. Specifically, Father argues that he does not suffer from any emotional or mental illness that makes him unfit to parent; he was never abusive or cruel toward L.W.; he does not use drugs or alcohol; he is not guilty of any felony; L.W. did not suffer injuries while in Father's care; and the public agencies failed to make reasonable efforts to rehabilitate him. See K.S.A. 38-2269(b)(1)-(7) (listing factors considered by the court when terminating parental rights). While Father is right that he is not accused of unfitness for these reasons—the absence of such violative conditions does not necessarily make him able to care for L.W. In fact, a violation of one single statutory factor can support a district court's finding of unfitness. K.S.A. 38-2269(f). Father's compliance with the typical conditions and conduct of safe parenting is not counted as plus factors weighed against the court's findings of unfitness for separate reasons.

17

Father also argues that he substantially complied with and completed the case plan tasks supporting reintegration. Cases involving the termination of parental rights are heavily fact specific, requiring the district court to weigh multiple factors and assign credibility determinations. In accordance with that requirement, the district court acknowledged that Father completed several case plan tasks toward reintegration with L.W. without issue—but then had to determine the importance of those completed tasks relative to the tasks Father failed to complete.

Father alleges that the district court erroneously stated he did not complete anger management classes, but Father "testified specifically credibly as to his involvement with the anger management classes, noting that they were done once a week at a church in Wichita." Actually, the district court credited Father with attending the anger management classes but found Father's testimony that he completed and turned in the workbook was contrary to the available evidence. Father testified that he turned in the workbook just before the termination hearing and he had not yet received the certificate of completion. The SFM permanency specialist testified that they had been told by the anger management program director that Father had not turned in the workbook. The district court determined that the SFM permanency specialist's testimony about the anger management workbook was more credible and that Father did not fully complete the anger management program. Father's argument asks this court to reassess the district court's credibility determinations, which is not part of this court's appellate review. The district court's findings regarding Father's failure to complete anger management are supported by the evidence.

Father also questions the district court's credibility determination regarding his failure to pursue individual therapy. Father argues that he testified "he called over a dozen times to the local therapy provider Prairie View in order to set up therapy, but that his calls were not returned." After contradictory testimony, the district court determined that Father's failure to attend therapy was "an excuse, that he did not make sufficient

18

attempts to set this up, and that even when offered help he denied the help and refused to accept it." The district court's credibility determination about Father's failure to schedule individual therapy appointments was also supported by the evidence.

Father argues that the district court erred in finding his home was concerning because the issues cited could easily have been fixed. In its findings, the district court noted that it took Father until April 2023—partway through the termination hearing—to complete the walkthrough of his home after repeated requests, and there were still concerns for safety. Although there is some evidence supporting the district court's determination, it is not necessary to rely on this factual finding. This opinion therefore does not rely on the district court's findings regarding the readiness of Father's home.

As previously explained, a single statutory factor can support the district court's finding of unfitness. K.S.A. 38-2269(f). Under these circumstances, arguably the most important consideration in determining Father's fitness is his ability to care for L.W.'s special physical and behavioral health needs. Father claims that the district court erred in finding that he failed to complete the case plan task requiring him to attend L.W.'s medical appointments and retain and understand information related to L.W.'s medical conditions and providers. Father contends that SFM failed to make it clear he needed to engage in L.W.'s healthcare needs and SFM should have done more to make him aware of L.W.'s healthcare appointments. Contrary to Father's argument, the case plan included the requirement that he be involved with L.W.'s healthcare since May 2022—about a year before the termination hearing. Additionally, L.W. had regularly scheduled appointments and the SFM permanency specialist gave Father information about appointments at least twice. Father also denied doing any independent study to learn about L.W.'s health conditions.

L.W. requires extensive medical and therapeutic intervention. At the time of the termination hearing, L.W. had at least three therapy appointments a week including

19

physical therapy, occupational therapy, and speech therapy, which are expected to be ongoing. Of course, L.W.'s care provider needs to be involved with these appointments and understand the types of activities that need to occur throughout the week between appointments. In addition to therapy appointments, L.W. has regular pediatric appointments, doctor's appointments when her care provider is concerned, and neurology appointments—none of which Father regularly or even irregularly attended. The district court explained that Father did not understand the reality of L.W.'s numerous, serious conditions and needs; he failed to acknowledge that her case is drastically different from the conditions his older child faced; and he did not make any efforts to learn or understand L.W.'s conditions. As a result, the district court found that Father failed to complete the case plan task of attending L.W.'s medical appointments and learning about her conditions, and that finding is supported by the record. Father's reaction to questions about L.W.'s medical needs and his involvement demonstrate his inability to appreciate the seriousness of L.W.'s medical conditions. Although on hindsight review SFM could have done more to encourage Father's involvement in L.W.'s healthcare—it could not force him to be involved—and his failure to appreciate the importance of this task reinforces the significance of this failure.

Under these circumstances—where L.W. has serious medical conditions that require consistent medical intervention—Father's failure in this one case plan task alone can support the district court's findings of unfitness. A parent who cannot care for the special physical or mental needs of their child—despite their best efforts, love, or intentions and appropriate agency intervention—may still be found unfit to care for that child. See, e.g., *In re M.P.*, No. 119,444, 2019 WL 2398034, at *6 (Kan. App. 2019) (unpublished opinion) (finding unfitness when the parent was unable to care for the child's special healthcare needs). Father demonstrated care and love for L.W. and completed several of the case plan tasks, but after years of agency intervention has not demonstrated the ability to understand and provide for L.W.'s healthcare needs.

The district court's finding that Father failed to accomplish the case plan tasks to complete anger management, attend individual therapy, and participate in L.W.'s healthcare appointments and learn about L.W.'s health needs are all supported by the record. These factual findings provide clear and convincing support for the district court's conclusion that Father was presently unfit to care for L.W. because—despite SFM's reasonable efforts—Father's home could not be rehabilitated; Father lacked effort to adjust his circumstances, conduct, or conditions to meet L.W.'s needs; and Father failed to assure L.W.'s care when in his home when able to do so. See K.S.A. 38-2269(b)(7)-(8), (c)(1), (c)(3).

*Father's conduct or condition was unlikely to change in the foreseeable future.*

After determining the district court's finding of unfitness is supported by clear and convincing evidence, this court must determine whether the district court properly found that such unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). Father claims that the district court's findings of unfitness could easily be remedied and thus the condition was not unlikely to change. This court views the foreseeability of a parent changing the conditions or conduct rendering them unfit through the child's perception of time. The "time perception of a child differs from that of an adult." *In re M.B.*, 39 Kan. App. 2d 31, Syl. ¶ 9, 176 P.3d 977 (2008). In recognition that young children experience the passage of time differently than adults—with the child's time away from a parent seeming longer to the child than the parent—there is a statutory preference toward final resolution. See K.S.A. 38-2201(b)(4) (requiring courts to "dispose of all proceedings . . . without unnecessary delay"). Although a parent with unlimited time and opportunities might be able to adjust their circumstances to appropriately care for their child, the court cannot extend unlimited opportunities while the child waits for such an adjustment.

21

On the first day of the termination hearing, L.W. had been out of Father's home for around 22 months—since she was three months old. Therefore, L.W. had no memory or measurable experience living in Father's home. During the 22 months preceding the termination hearing, Father failed to exercise his visitation time with L.W. to establish a meaningful relationship or achieve reintegration. At one point, Father and Mother were permitted six hours of monitored visits per week, but by the time of the termination hearing, Father's visitation had been reduced to just 30 minutes per week. Additionally, during that time Father was unable to complete all the case plan tasks as explained above. Importantly, Father did not take those 22 months to participate in L.W.'s healthcare or therapy appointments, learn about her conditions, or communicate with her care providers. Given that Father failed to complete the case plan tasks identified above for approximately two years before the termination hearing—there is no indication in the record that he could accomplish the necessary tasks in a more timely manner if given additional opportunity. The vast majority of L.W.'s life has been spent outside of Father's home and care and nothing in the record indicates that L.W. could be reintegrated into Father's home in the foreseeable future from L.W.'s time perspective. There is clear and convincing evidence supporting the district court's determination that Father's unfitness was unlikely to change in the foreseeable future.

CONCLUSION

Upon review of the evidence in the most favorable light to the State, the district court's determination that Father was presently unfit by reason of conduct or condition that renders him unable to properly care for L.W. and that such conduct or condition was unlikely to change in the foreseeable future is supported by clear and convincing evidence. Father had almost two years to complete case plan tasks designed to reintegrate L.W. into his home and care, and he failed to complete tasks critical to that plan. Although Father did not meet some of the more common factors of unfitness—his failure

to understand and appreciate L.W.'s healthcare needs and demonstrate an ability to provide for her specialized care is of critical importance to the district court's findings.

Affirmed.

* * *

PICKERING, J., concurring:  I agree with the majority that the district court did not err in terminating Father's parental rights. Still, I would address the court's best interests of the child finding because of the benefits derived from appellate review of a CINC parental termination case.

In this case, the district court did find that terminating Father's rights was in the best interests of L.W. Because we have established that a district court is in the best position to determine the best interests of a child, the district court's judgment will not be disturbed on this point unless it has abused its discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

*K.S.A. 38-2269 sets forth the CINC parental termination statutory requirements.*

Here, the district court was required to make three findings before Father's parental rights could be terminated. The court must find by clear and convincing evidence that (1) the parent is unfit, (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and (3) termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g)(1); *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 2, 246 P.3d 1021 (2011). Thus, once the district court makes a finding of unfitness and that the parent's unfitness is unlikely to change in the foreseeable future, the district court still must consider whether terminating parental rights "is in the best interests of the child." K.S.A. 38-2269(g)(1); *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 2.

23

In deciding whether termination of parental rights is in the best interests of the child, "the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 38-2269(g)(1). We have recognized that "the formative years for children are brief and if parents cannot or will not make changes in their lives to accommodate the return of their child, the district court will terminate their parental rights if it is in the best interests of their child to do so." *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

On appeal, Father implies that the district court erred in finding that terminating his rights was in the best interests of L.W. His brief contains a footnote, which states: "[I]t is in L.W.'s best interest for reintegration to occur." In support, Father claims that he had "raised a child before to successful adulthood, and a parent-child relationship is one that should not be severed unless it is of the utmost need." However, he does not rely on this issue, and he does not provide any additional argument or legal authority in support of this issue. A party's failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief an issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Issues not adequately briefed are deemed waived or abandoned. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

*We have taken two appellate review paths.*

Once it has been determined that the issue has been waived or the parent has elected not to challenge the district court's finding, our court has chosen one of two appellate review paths. The first path is to decline to address the court's finding regarding the best interests of the child. See *In re L.E.*, No. 120,507, 2019 WL 4724760, at *5, 10 (Kan. App. 2019) (unpublished opinion). The second path is to address the issue because

24

of the significance of terminating a parent's rights. *In re E.G.*, No. 108,300, 2013 WL 452172, at *5 (Kan. App. 2013) (unpublished opinion).

I agree with the panel in *In re E.G.* There, the panel found that the father had not "specifically argue[d] that the district court erred in finding that the best interests of the child supported terminating Father's parental rights." 2013 WL 452172, at *5. Nevertheless, the panel chose to address this issue because of "the importance of the termination of parental rights." 2013 WL 452172, at *5. "The termination of parental rights in Kansas is a serious and permanent legal step that severs natural parental bonds forever." *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 689, 251 P.3d 651 (2011). Unquestionably, a parental rights termination proceeding interferes with a parent's fundamental liberty interest in the care, custody, and control of his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Given these high stakes, the second path allows us to consider the entire CINC parental termination statutory scheme as it relates to this case, namely, findings regarding the unfitness of the parent; whether the unfitness is likely to change in the foreseeable future; and the best interests of the child.

*The district court's ruling regarding the best interests of the child*

As part of its ruling, the district court made a finding that the termination of Father's parental rights was in the best interests of L.W. The journal entry of the court's finding of unfitness and order terminating parental rights stated: "Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child named above and the physical, mental or emotional needs of the child would best be served by termination of parental rights."

Unfortunately, the district court did not specifically list the factors and findings that it considered and relied upon in deciding that terminating Father's right to parent

L.W. was in her best interests. We have stated that the "better practice" is for the district court's journal entry to "reflect" the factors considered in determining a child's best interests. *In re N.L.*, No. 116,741, 2017 WL 2714981, at *6 (Kan. App. 2017) (unpublished opinion). This is not, however, required when the court's determination is supported by the record. 2017 WL 2714981, at *6. I now turn to the record.

Notably, the district court in this case made significant findings of fact in its termination order. For instance, the court order stated that Father "has completely failed to look into what [L.W.] is going to need for her ongoing care, to know what provisions or tools he is going to need in his household to continue to provide for her care. Father lacks a complete understanding of the reality of [L.W.]'s medical-physical situation." As stated in K.S.A. 38-2269(g)(1), the court's consideration of L.W.'s physical needs is required when determining whether parental termination is in the best interests of the child.

Additionally, testimony from both the CASA advocate for L.W. and the SFM permanency specialist regarding L.W.'s best interests is important. Both witnesses testified that terminating Father's parental rights was in L.W.'s best interests. The CASA advocate testified that he believed L.W.'s interests would best be served staying with her foster family. The CASA advocate also testified as to why he believed Father did not possess the ability to care for L.W., noting how Father refused to complete and turn in the anger management workbook and how, in general, he found that Father lacked initiative to complete the case management goals.

After that evidence, the SFM permanency specialist explained that for the past several months, Father had not participated in L.W.'s life well enough to know how to care for her. She believed it would take a year to reintegrate Father and L.W., but only if Father promptly took steps to begin actively participating in her life. The passage of a year for a parent to improve cannot be overlooked as a child's perception of the passage

26

of time is different from that of an adult. See K.S.A. 38-2201(b)(4). Further, evidence was presented that L.W. was doing well in the care of her present placement.

All of this testimony, along with the district court's factual findings, provides great weight towards finding that terminating Father's parental rights was in the best interests of the child. I find the district court did not abuse its discretion in finding that termination of Father's parental rights was in L.W.'s best interests. I concur in affirming the district court's ruling terminating Father's parental rights.